# IN THE SUPREME COURT OF IOWA

No. 13–0739

Filed June 30, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**JUSTIN ALEXANDER MARSHALL,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Johnson County, Sean W. McPartland, Judge.

The State seeks further review of a court of appeals decision reversing the defendant's conviction for murder in the first degree. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Kent A. Simmons, Bettendorf, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Janet Lyness, County Attorney, and Meredith Rich-Chappel, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider whether the State violated Justin Marshall's right to counsel through the acquisition of evidence from jailhouse informants. The district court rejected the claim, and a jury convicted Marshall of first-degree murder. The court of appeals reversed, holding the State had violated Marshall's Sixth Amendment right to counsel by using a jailhouse informant to obtain incriminating information when Marshall was represented by counsel. Finding the error was not harmless, the court of appeals reversed Marshall's conviction.

In light of the remand, the court of appeals also considered whether the trial court's instructions on aiding and abetting and joint criminal conduct violated due process of law because the instructions were not supported by substantial evidence. The court of appeals rejected Marshall's due process claim.

We granted further review. We retain discretion to consider all issues raised in the original appeal or limit our opinion to selected issues. *Botsko v. Davenport Civil Rights Comm'n*, 774 N.W.2d 841, 844 (Iowa 2009). In our discretion, we consider only Marshall's right-to-counsel challenge. The court of appeals ruling on the due process challenge to jury instructions stands.

For the reasons expressed below, we affirm in part and vacate in part the court of appeals decision, reverse the trial court ruling on the violation of the right-to-counsel issue, and remand the matter for a new trial.

### I. Procedural and Factual Background.

**A. Overview of the Crime.** John Versypt was the landlord of the Broadway Condominiums complex in Iowa City. On October 8, 2009,

Versypt was shot while hanging a sign at the complex. He suffered two gunshot wounds, one to his forehead and the other to his right hand, along with other injuries. He was discovered by a tenant shortly after being shot. On the ground near Versypt were a wallet, a gun, a few tools, and the sign. Versypt died at the scene.

Charles Thompson and Marshall were both staying at an apartment in the complex with Marshall's aunt on the date of the murder. In February 2010, the State originally charged Thompson[1] with murder in connection with Versypt's death. Police, however, soon came to suspect Marshall in connection with the slaying. On July 12, 2011, the lead detective on the case for the Iowa City police, Jennifer Clarahan, swore out a complaint against Marshall for the murder. The complaint was filed in Johnson County District Court the following day.

**B. Meetings with Confidential Informants Prior to and After Arrest of Marshall.** On July 12, Detective Clarahan and Detective Michael Smithey met with Carl Johnson, a federal prisoner, at the Muscatine County Jail. They told Johnson they sought information on Charles Thompson, Courtney White, and Justin Marshall in connection with Versypt's murder. At the time of the meeting, Marshall was at large in Texas. When Marshall was arrested in Texas and brought to Iowa, he was immediately sent to the Muscatine County Jail. Marshall was charged with Versypt's murder on August 1, 2011. Iowa City police had subsequent contacts with Johnson and two other inmates—Earl Freeman and Antonio Martin—at the Muscatine County Jail. All three

---

[1]Thompson's trial in connection with Versypt's murder ended in a mistrial. The State declined to retry Thompson.

inmates had obtained information about the crime from Marshall while he was incarcerated in Muscatine.

    **C. Disclosure of Relationship with Confidential Informants.** In March 2012, the State identified the inmates as additional witnesses in Marshall's upcoming trial in a notice of additional testimony. The State noted that Martin and Johnson were in "a cooperation agreement with the United States Attorney for the Southern District of Iowa." The minutes, however, did not indicate any other relationship between the three inmates and the State.

    Marshall's trial was scheduled to commence on January 22, 2013. On January 17, Marshall's counsel received an email from the State with two letters from Freeman to Detectives Clarahan and Smithey dated September 21 and October 26, 2011. In the September 21 letter from Freeman to Detective Clarahan, Freeman stated that he was in the cellblock with Marshall, that he could back up information the State had been provided on Marshall, and that if Marshall were kept in the block "we could get a lot more information." The October 26 letter from Freeman to Detectives Clarahan and Smithey asked, among other things, that Detectives Clarahan and Smithey advise federal prosecutors and Freeman's attorney that "[Freeman] helped in [their] investigation and prosecution of Justin Marshall."

    The trial began as scheduled. Freeman was deposed a second time in the middle of the trial on the evening of January 31 to resolve an unrelated matter. At this time, Marshall's attorney received a letter dated January 26, 2013, from the Johnson County Attorney to Richard Westphal, a federal prosecutor in charge of handling Freeman's pending federal drug prosecution. In this letter, the county attorney explained in detail how Freeman cooperated first with the trial of Thompson and then

with the trial of Marshall for the death of Versypt. The county attorney stressed that, while Freeman's information had been helpful regarding the Thompson matter, it was also "extremely helpful" to the State in Marshall's prosecution. She closed by requesting that Freeman receive a reduction in his federal sentence because of his assistance in both the Thompson and Marshall cases.

### D. Trial Testimony and Midtrial Motion to Suppress.

1. *Opening trial testimony of Detective Smithey.* Detective Smithey was called as a witness at Marshall's trial. He described that pursuant to a cooperation agreement, a federal defendant could get a reduction in his or her sentence for providing information. Such a reduction would be recommended by the United States Attorney and approved by a judge. Detective Smithey testified that at the time of the July 12 meeting with Johnson, Johnson had a cooperation agreement with the government. Johnson had already pled guilty and was awaiting sentencing. Detective Smithey testified that when the police interview someone in connection with a cooperation agreement, they would not provide "specific information about how [the informant] should gather information." Detective Smithey stated it was his understanding that providing specific instructions "would be bypassing . . . certain rights that people have who are incarcerated."

Detective Smithey testified he told Johnson at the July 12 meeting that the State was interested in information related to the Versypt murder and particularly interested in information about Charles Thompson, Justin Marshall, and Courtney White. He made no promises regarding what Johnson would receive in exchange for the information, but Johnson was aware or was made aware that the United States Attorney would be advised of any information provided. Detective

Smithey testified that, pursuant to the July 12 meeting, Johnson "was trying to provide information that would be used to determine what reduction [in sentence] he would receive." He testified it was probably reasonable to assume that Johnson would communicate the State's interest in Marshall to other cooperating witnesses.

2. *Marshall's midtrial motion to suppress.* Marshall then made an oral, midtrial motion to suppress the testimony of Johnson, Martin, and Freeman. At a hearing on the motion, Marshall offered into evidence the September 21, 2011, October 26, 2011, and January 26, 2013 letters. Marshall maintained that Freeman, Johnson, and Martin "were engaged in a pattern of seeking out Mr. Marshall [and] of working at the behest of the police or agents of the State while Mr. Marshall was represented by Counsel." Marshall asked the court to prohibit the State from calling Johnson, Martin, and Freeman to testify about Marshall's conversations with them because it would be an "end run around Mr. Marshall's right to have counsel present while agents of the State are questioning him." While Marshall's counsel stated that he was challenging the testimony of the three informants on grounds of Marshall's right to counsel, he did not explicitly mention either the Sixth Amendment of the United States Constitution or article I, section 10 of the Iowa Constitution.

The district court took a recess, read the letters, and then reconvened the hearing to ask Marshall and the State for relevant authority. After the brief recess, the State cited *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S. Ct. 2616, 92 L. Ed. 2d 364 (1986), and *Moore v. United States*, 178 F.3d 994 (8th Cir. 1999), as standing for the proposition that an "informant becomes a government agent only when the informant has been instructed by the police to get information about the particular

defendant." Marshall's attorney did not offer caselaw. The State then called Detectives Smithey and Clarahan as witnesses.

3. *Testimony of Detective Smithey at midtrial hearing on motion to suppress.* Detective Smithey testified that he first met with Johnson on things unrelated to the Versypt murder. He explained that on July 12, 2011, he had a meeting with Johnson, Johnson's attorney, and Detective Clarahan at the Muscatine County Jail "to do a proffer agreement" with Johnson. Detective Smithey stated that the purpose of the meeting was "[t]o find out if Carl Johnson had information about . . . the death of John Versypt." He stated that he did not request Johnson gather more information, but that he "only requested that [Johnson] contact [him] if he learned anything further." Detective Smithey further stated that he did not make any effort to have Marshall placed in a cell with anyone in particular.

Detective Smithey testified that on September 12 Johnson's attorney informed him that Johnson now had information about the Versypt murder. As a result, Detective Smithey and Johnson met on September 15. At the meeting, Detective Smithey said Johnson told him about statements made by Marshall while they were incarcerated in segregation together at the Muscatine County Jail in August of 2011. Detective Smithey repeated that he did not ask Johnson "to do anything to try to obtain more information or any information" from Marshall regarding Versypt's death. Detective Smithey testified he told Johnson "[o]nly to contact [him] if he learned anything."

Detective Smithey further testified that he met with Freeman on October 3 at the Muscatine County Jail to discuss what he had learned about Marshall's involvement in the Versypt murder. Detective Smithey said that he did not ask Freeman to do anything further in the

investigation, only "to contact [the detective] if there was additional information [Freeman] wished to relay." Detective Smithey testified that after speaking with Freeman he also met with Antonio Martin at the Muscatine County Jail on October 3. According to Detective Smithey, he happened to see Martin after completing his session with Freeman. Detective Smithey stated he had previously done proffer interviews with Martin on other matters. He further conceded that he "may have asked [Martin] if he had any knowledge" of the Versypt murder during one of the first proffers, but if so, it was a simple "do you know any information about this?" Detective Smithey stated that he did nothing to put Martin or Freeman "in the same vicinity" of the Muscatine County Jail with Marshall. He testified he did not ask Freeman, Martin, or Johnson "to do anything" to gather further information from Marshall.

4. *Testimony of Detective Clarahan at midtrial hearing on motion to suppress.* Detective Clarahan also testified at the hearing on the motion to suppress. Detective Clarahan said that she met with Johnson on July 12, 2011. She stated she did not request Johnson to obtain information from Marshall, nor did she hear anyone make such a request. She also said that she had not arranged for Johnson to be placed in the same cellblock as Marshall. Detective Clarahan confirmed receipt of the two letters that Freeman had sent her. She also stated she received a phone call from Freeman at home on October 1, 2011, during which Freeman stated he had information about Versypt's murder. Detective Clarahan told the court she met with Freeman along with Detective Smithey on October 3, but had not joined Detective Smithey when he met with Martin. Detective Clarahan said she did not ask Freeman to do anything on behalf of the State.

At the motion to suppress, no party presented the testimony of Freeman, Johnson, or Martin. Further, Marshall did not testify. As a result, no evidence was offered at the motion to suppress regarding the role or nature of the participation of each of the informants in the communications between Marshall and the informants about the crime.

5. *Ruling on the motion to suppress.* After hearing the testimony of Detectives Smithey and Clarahan, the district court overruled the motion to suppress. The court recognized and the State conceded that Marshall's Sixth Amendment right to counsel had attached. The court ruled, however, that in order to violate the Sixth Amendment right to counsel, "[t]he defendant must demonstrate that the police and their informant took some action beyond merely listening that was designed deliberately to elicit incriminating remarks." The court concluded that the case "presents just the sort of luck or happenstance that resulted in these gentlemen coming forward and providing information to the State."

6. *Freeman trial testimony.* After ruling on the motion to suppress, trial resumed. The three informants then testified on behalf of the State. Freeman said that he first met Marshall when he was placed in the same cellblock in the Muscatine County Jail. Freeman testified that Marshall approached him, stating that he was not satisfied with his attorney, and asked Freeman to help him draft a motion to appoint new counsel. According to Freeman, inmates Antonio Martin and Richard Sandifer sent Marshall to him. Freeman testified that Sandifer told Marshall that Freeman had filed a motion for a different attorney and that the motion had been granted. Freeman said that he did not know whether Johnson was involved in sending Marshall to him.

Freeman stated that he wrote the motion for new counsel for Marshall, which Marshall filed with the court. Freeman declared that

Marshall told him about Charles Thompson being tried for Versypt's murder, that Thompson was "acquitted on a mistrial," and that Marshall wanted to see if he could get his charge dropped from murder to manslaughter. Freeman testified that he and Marshall went over a paper that contained a definition of manslaughter in Freeman's cell. According to Freeman, he told Marshall that Marshall would have to convince his own lawyer that Versypt's death was an accident for manslaughter to work.

Freeman testified Marshall told him he intended to rob Versypt, Versypt grabbed for the gun, the gun went off, and Versypt was shot in the hand and in the head. Freeman recalled Marshall told him that Versypt fell and that he wiped off the gun with the front of his jacket and "took off." According to Freeman, Marshall wanted him and another inmate to go to their attorneys to "explain to them that Justin confessed . . . to the shooting, but that it was an accident." Freeman stated that he told Marshall if he wanted to do that, he would need to write it down "so all our stories would be the same." Freeman testified, "[W]e all talked about how he could try to convince his attorney that it was an accident."

The prosecutor asked Freeman whether he in any way tried to push Marshall to make admissions. Freeman responded,

> I'd say yes. After he started to—admitting to doing it, yeah, I would probably say, yeah, I did push him to tell me information. . . . Once I realized that I thought he actually did it, I was, you know, wanting to know what happened.

Freeman testified that he was in prison on a federal charge of conspiracy to manufacture methamphetamine and that he had not been sentenced when he contacted the detectives about Marshall in October 2011. Freeman stated he did not have a cooperation agreement with the United States Attorney, but Freeman had hoped to get "cooperation time off"

from his sentence for his testimony about the Versypt murder. Freeman testified that he did not receive any reduction in his sentence because of the information provided to the Iowa City police about Marshall. When confronted with the January 26, 2013 letter from the Johnson County Attorney to federal authorities, Freeman agreed that the letter might help him get a reduction in his sentence in the future.

7. *Johnson trial testimony.* Johnson stated he had been living at Broadway Condominiums when Versypt was murdered. Johnson said he was acquainted with Marshall but they were not good friends. Johnson testified he talked to Marshall about the murder once shortly after the event, and Marshall indicated that "folks," apparently meaning Thompson, were responsible for the crime.

In the summer of 2011, Johnson stated he was in jail after pleading guilty to a federal charge of distributing cocaine and had a proffer agreement with the United States Attorney's Office to assist in other investigations. Johnson said he had provided such assistance to police in about four other cases. Johnson stated he had testified against his coconspirator. As part of his cooperation agreement, Johnson testified that he met with Detective Smithey on July 12. At the July 12 meeting, Detective Smithey asked Johnson if he knew Marshall before Johnson had been arrested.

Johnson testified that he was placed in segregation at the Muscatine County Jail because of jailhouse rule violations. According to Johnson, Marshall was also in segregation at that time, and over a ten-day period, they interacted during their hour-a-day reprieve from solitary confinement when they were permitted to leave their cells.

Johnson stated, "I asked him what was he in there for." According to Johnson, Marshall responded, "[T]hey got me for that landlord." The

State asked Johnson a series of questions limited to information that Marshall told him about the crime. In response to the series of questions, Johnson testified,

> [H]e told me, he say that they didn't have no evidence on him and they didn't have no witnesses. The only witnesses they had was the police. . . . He told me that he—he left Iowa City. He went to Burlington because the police kept bothering him and other people was implicating his name in a murder. . . . He said when the police came down there to Burlington, harassing him, threatening him he wasn't going to see his family again if he didn't tell them what happened, he told me that's when he knew they didn't really have evidence on him because they had previously before let him go, so that's why they left and went to Burlington.
>
> . . . at first he said that they had nothing on him, and then he said all they had was a little gun powder on him. . . . He was looking at a lot of time. . . . He told me that him, Weezy [Thompson], and Calvin was in the hallway, they was all in the hallway playing dice. After a while Charles Thompson left and went inside his apartment. That's when he came up with the idea that he wanted to rob the landlord. . . . He say he wanted to rob the landlord because he knows some people pay with money and some pay with cash. . . .
>
> He said, after Weezy went into the house, when he came up with the idea, the robbery went wrong. . . . The landlord got shot. . . . All he said was it was real—the shot was loud. It was loud in the hallway, and that kind of froze him up, and after that he ran out the back to get away from the scene. . . . When he came back in the building, he was knocking on the door, but he was whispering because he didn't want no one to know he was in the hallway. . . . Charles Thompson's trial was coming up, and he said he was supposed to testify at his trial, and if he do, he was going to say that he [Thompson] did it. . . . To shift the weight off himself.

Although Johnson thus testified extensively and in considerable detail about what Marshall said to him, the State did not ask, and Johnson did not volunteer, what Johnson said in response to Marshall's statements or what his role was in the conversation after his initial inquiry.

Likewise, the defense did not ask about what Johnson said or did when Marshall provided him with the information.

8. *Martin trial testimony.* Martin stated that he was serving a federal sentence and entered into a plea and cooperation agreement in February of 2011. After entering into the cooperation agreement, Martin said that he had been interviewed twice regarding information he had about drug cases. Martin said he testified against his cousin, a codefendant in his own case. Martin claimed he did not know whether he would get any kind of reduction for his testimony. After testifying against his cousin, however, Martin stated that his sentence was reduced from between twenty-seven and thirty-two years to twelve years and one month.

Martin testified that he had not received a reduction for providing information in the Marshall case and that he received no promises in exchange for his testimony. Martin admitted, however, that he did hope that he could receive a further reduction and that the United States Attorney's Office would ask the judge for a reduction.

Prior to his incarceration, Martin stated he lived in the Broadway Condominiums neighborhood and knew Marshall and Thompson. Martin testified his last communication with Marshall was around September 2009.

After Marshall arrived at the Muscatine County Jail, Martin testified that he was moved from one housing pod to the pod where Marshall was incarcerated. When in the same housing pod, Martin recalled that Marshall told him, "[T]hey got me on that BS, that Broadway case, that Broadway murder case." Martin further recalled that later on, probably in September, Marshall told him "he didn't have nothing to do with it." Martin told Marshall that he—Martin—was

testifying against one of his codefendants. Martin remembered that they had additional conversations about Marshall's situation. As with Johnson, the State asked Martin a series of questions about what Marshall said to him. Martin testified Marshall told him that

> the person's—victim's fingerprints was on the gun, that the bullet went through his hand, through his face, and there was a drill, a wallet and something else next to the body or something that they found, and there was no money missing out of the wallet. . . [h]e was saying it's a robbery . . . .

Martin was next asked whether the two talked about Marshall writing something down. Martin testified that they had discussions about a lesser charge and that Marshall might confess and tell his side of the story. Marshall asked Martin to get legal information for him regarding the crimes of manslaughter and armed robbery. Martin testified,

> And I told him, you know, you might have to tell your side of the story if you're going to get a lesser charge. So he went to write the story down, saying use me [Martin] as a jailhouse snitch and I can get your story out and it might help both of us. So he went and wrote it down and gave me what was his version of what happened.

Martin repeatedly emphasized that he told Marshall, "I said that you might have to tell—tell your side of the story, you know, your involvement in it, you know, because they—they say one thing. You might got to tell the truth of what really happened."

Martin testified that Marshall told him information about the crime for which Marshall was charged. According to Martin,

> [H]e was giving me one account and he was saying that he was going to take the gun to sell it to somebody and run downstairs. Then . . . he started switching his story up, he started saying that he was at—at Junior's house playing a game and got home. He was going to go downstairs to get him something to eat, you know. He was just like arranging his story. That's when I told him just write it down.

Martin stated that Marshall provided him further details about the crime:

> He said he went downstairs and somebody came up behind him saying something, coming, approaching him, and he got scared and he turned around and pulled the gun from his waistband. . . . He said it all happened so quick, you know. The gun went off and he dropped it and picked it back up and wiped it off and dropped it again and ran.

Martin testified that Marshall wrote down his story and that the plan was "for [Martin] to take it to [his] lawyer . . . to get [Marshall's] story out." Martin said that Marshall told him that he hoped that his story would get him a lesser charge. Martin testified he began taking his own notes once Marshall told him details of the crime to provide to his attorney. He then set up a telephone meeting with his attorney on October 3 in a room set up for prisoner conferences with attorneys. Martin stated he had with him his notes about Marshall and Marshall's notes about the crime. During the conversation with his attorney, Detective Smithey entered the room. Martin then told Detective Smithey that he "had some information about the Broadway murder." He showed Detective Smithey the yellow legal pad with Marshall's notes. When Detective Smithey asked if he could take the yellow legal pad, Martin responded no because "[Marshall] didn't know [he] was talking to [Detective Smithey] about that, and it wasn't the plan to give it to [Detective Smithey] right then." Instead, Martin recalled, Detective Smithey made a copy and returned the yellow legal pad to Martin.

Martin testified that he knew Johnson and Freeman. Although he was housed with Johnson in the same pod for two or three weeks in August of 2011, Martin denied ever talking with Johnson. Martin admitted, however, that he and Freeman discussed what Marshall should include in his written statement.

Through Martin, the State offered two exhibits purporting to be Marshall's handwritten notes into evidence. Along with other material in the notes, Marshall provided Martin with a written description of the events of October 8, 2011, in which Marshall claimed the shooting was an accident. Marshall's notes stated, "I gave up everything now you tell me do the descriptions fit. I done told you the truth, now you telling me that isn't it." The exhibit also contained a definition of ignorance or mistake of law in what appeared to be Marshall's handwriting. On cross-examination, Martin admitted that Marshall sought information from him about the legal definition of manslaughter. Martin repeated once more that he "told [Marshall] to tell his side of the story." Martin acknowledged that the Johnson County Attorney could write a letter to the United States Attorney and ask for a reduction in his sentence for testifying against Marshall.

**E.  Verdict and Posttrial Motions.** On February 7, 2013, the jury found Marshall guilty of murder in the first degree. The verdict included special interrogatories. No juror found Marshall guilty under the theory of premeditation, willfulness, and deliberation. Seven jurors found Marshall guilty under the theory of felony murder. Eleven jurors found Marshall guilty under the theory of aiding and abetting. Two jurors found Marshall guilty on the theory of joint criminal conduct.

On March 13, 2013, Marshall's attorney filed a joint motion in arrest of judgment and for a new trial. Marshall argued the prosecution engaged in prejudicial misconduct by withholding the two letters that Freeman sent to the detectives in September and October 2011, which the defense only obtained in January 2013. This, the defense argued, prevented Marshall from making an effective suppression motion by requiring the suppression hearing to be conducted "ad-hoc, on the fly"

during trial. The district court denied the motion. On the issue of prosecutorial misconduct, the court stated the defense was aware of the testimony of the three jailhouse informants well in advance of trial. The district court also found that the defense had not established a *Massiah* violation. *See Massiah v. United States*, 377 U.S. 201, 207, 84 S. Ct. 1199, 1203, 12 L. Ed. 2d 246, 251 (1964). According to the district court,

> [T]he . . . Defendant had not established the informants were government agents at the time the information was solicited, a necessary requirement. . . . Rather, from the evidence in the record, it appear[ed] the inmates collected information prior to and without being approached by the police and later turned it over to the officers.

Because the court concluded the inmates were not governmental agents at the time they solicited information from Marshall, the court found he was not entitled to a new trial.

**F. Decision of Court of Appeals.** Marshall filed a timely notice of appeal, and we transferred the case to the court of appeals. The court of appeals held that Johnson was acting as an agent of the State because Detective Smithey asked Johnson to get information about Marshall's involvement in the Versypt murder on July 12, 2011, Johnson was being "paid" in reduced prison time for the information as part of his proffer agreement, and Detective Smithey "clearly . . . did not tell Johnson to be a passive listener, nor did he communicate anything close to that." Therefore, the court held statements Marshall made to Johnson should have been suppressed as violating Marshall's Sixth Amendment right to counsel. However, the court of appeals did not find that Freeman or Martin were acting as agents of the State when they obtained information from Marshall, and the suggestion that Johnson must have

communicated with Freeman or Martin about Marshall was not sufficient to prove agency.

The court of appeals, noting that the State had not raised the issue of harmless error, declined to engage in a sua sponte harmless-error review because the harmlessness of the error was debatable. A concurrence emphasized that the placement of Marshall, Freeman, Johnson, and Martin in the Muscatine County Jail could hardly be considered a coincidence. A dissent took a different approach. The dissent focused on the question of deliberate elicitation. The dissent found the defendant failed to provide proof on this issue. As a result, the dissent argued that the trial court should be affirmed in all respects.

The State applied for further review, which we granted.

## II. Standard of Review.

We review constitutional claims de novo. *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010); *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005).

On a motion to suppress evidence obtained in violation of a defendant's constitutional rights, the defendant generally has the burden of proving the violation by a preponderance of the evidence. *State v. Post*, 286 N.W.2d 195, 201–02 (Iowa 1979); *accord United States v. Johnson*, 225 F. Supp. 2d 1022, 1036 (N.D. Iowa 2002), *rev'd on other grounds*, 352 F.3d 339, 344 (8th Cir. 2003). While the burden may shift to the state in certain situations, when a defendant alleges that an agent of the state violated his right to counsel the defendant must show that the violation occurred. *United States v. Henry*, 447 U.S. 264, 277, 100 S. Ct. 2183, 2190, 65 L. Ed. 2d 115, 126 (1980) (Powell, J., concurring) ("To demonstrate an infringement of the Sixth Amendment, a defendant must show that the government engaged in conduct that, considering all of the circumstances, is the functional equivalent of interrogation."). *But cf.*

*United States v. Johnson*, 196 F. Supp. 2d 795, 841 (N.D. Iowa 2002), *rev'd on other grounds*, 338 F.3d 918, 923 (8th Cir. 2003) (noting that the defendant conceded that she bore the burden of proof, but suggesting that there could be a distinction in who bears the burden of proof with respect to a *Massiah* violation on direct appeal rather than in a habeas action).

**III. Preliminary Issue: Consideration of Trial Testimony on Merits of Motion to Suppress.**

As noted above, the informants did not testify at the midtrial motion to suppress hearing, but did testify at trial. Evidence offered at trial may be considered in reviewing the merits of a previously determined motion to suppress. *State v. Brooks*, 760 N.W.2d 197, 203–04 (Iowa 2009).

**IV. Claimed Invasion of Right to Counsel Through Use of Jailhouse Informant**.

**A. Introduction.** Ours is an accusatorial, not an inquisitorial, system of criminal justice. *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S. Ct. 735, 739, 5 L. Ed. 2d 760, 766 (1961). A defendant's right to effective assistance of counsel is critical to the fairness of the proceedings. *See Maine v. Moulton*, 474 U.S. 159, 170–71, 106 S. Ct. 477, 484, 88 L. Ed. 2d 481, 492–93 (1985). As noted in *Henry*, "[I]f the Sixth Amendment 'is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse.'" 447 U.S. at 273, 100 S. Ct. at 2188, 65 L. Ed. 2d at 124 (quoting *Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203, 12 L. Ed. 2d at 250).

The use of jailhouse informants to obtain information from defendants represented by counsel is problematic for a number of

reasons. As noted by the United States Supreme Court, the jailhouse is an unusual environment where a sense of camaraderie can mask real interests, where defendants may be particularly vulnerable, and where scheming and bravado are higher on the hierarchy of values than reporting the truth. *See Illinois v. Perkins*, 496 U.S. 292, 303, 110 S. Ct. 2394, 2400, 110 L. Ed. 2d 243, 255 (1990) (Brennan, J., concurring); *Henry*, 447 U.S. at 274, 100 S. Ct. at 2188–89, 65 L. Ed. 2d at 124 ("[T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make [the defendant] particularly susceptible to the ploys of undercover Government agents.").

Further, the use of jailhouse informants who stand to benefit— sometimes substantially—for providing evidence against a defendant raises substantial questions of reliability. The Supreme Court noted over fifty years ago that "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee v. United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 973, 96 L. Ed. 1270, 1277 (1952). On the question of jailhouse informers particularly, the United States Court of Appeals for the Fifth Circuit has observed that "[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987). More recently, the Fourth Circuit has observed that use of jailhouse informants is a "fertile field[] from which truth-bending or even perjury could grow." *United States v. Levenite*, 277 F.3d 454, 461 (4th Cir. 2002); *see also United States v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993); *Cervantes-Pacheco*, 826 F.2d at 315; *United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir. 1980); Russell D. Covey,

*Abolishing Jailhouse Snitch Testimony*, 49 Wake Forest L. Rev. 1375, 1380 (2014) [hereinafter Covey].

As the recent work of the Innocence Project demonstrates, jailhouse informants have played a significant role in convicting innocent persons. According to one study of persons exonerated by DNA evidence, false informant testimony supported the wrongful conviction in twenty-one percent of the cases. *See* Jim Dwyer, Peter Neufield, & Barry Scheck, *Actual Innocence: Five Days to Execution and Other Dispatches from the Wrongly Convicted* 246 (2000); *see generally* Covey, 49 Wake Forest L. Rev. at 1378. The reliability problems associated with informants poses a particular problem as they are often utilized in cases where the state has little direct evidence. Covey, 49 Wake Forest L. Rev. at 1418.

With respect to the potential lack of reliability of informants, the Supreme Court has responded by relying primarily on effective cross-examination of informants. *Hoffa v. United States*, 385 U.S. 293, 311, 87 S. Ct. 408, 418, 17 L. Ed. 2d 374, 387 (1966). In order to provide the defendant with effective means of cross-examination, the state has a duty to disclose the fact that informants are working for the state. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104, 108 (1972) (holding prosecutor had the duty to disclose to the defense a promise of leniency given to a key witness); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97, 10 L. Ed. 2d 215, 218 (1963) (holding suppressing evidence favorable to the defense violates due process).

Finally, the use of jailhouse informants undercuts the role of counsel as serving as a medium between the defendant and the state. *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487, 88 L. Ed. 2d at 496. Many

defendants have undue confidence in their ability to game the system that would be tempered by effective counsel. In addition, counsel can assist the defendant in developing an effective defense that may be impaired by ill-considered and imprecise statements made in the freewheeling jailhouse environment. *See generally* James J. Tomkovicz, *An Adversary System Defense of the Right to Counsel Against Informants: Truth, Fair Play, and the* Massiah *Doctrine*, 22 U.C. Davis L. Rev. 1, 39–62 (1988) [hereinafter Tomkovicz, *Adversary System*]; James J. Tomkovicz, *The* Massiah *Right to Exclusion: Constitutional Premises and Doctrinal Implications*, 67 N.C. L. Rev. 751, 766–67 (1989).

On the other hand, the state is not deprived of evidence because the defendant, acting on his own, has exercised poor judgment. The law books are packed with occasions in which the defendant has been apprehended primarily because of his or her own mistakes that, in hindsight, are quite remarkable. As noted in *State v. Leopardi,*

> it is no more unfair to use the evidence [the defendant] exposed through his lack of guile than it is to turn against [the defendant] clues at the scene of the crime that a brighter, better informed, or more gifted criminal would have hidden.

701 A.2d 952, 956 (N.J. Super. Ct. App. Div. 1997). Where a defendant unwisely spills his guts in the presence of a third party who simply serves as a passive listener to a heartfelt confession, literally does nothing to elicit the statement, and was simply in the right place at the right time, there is very little rationale for suppressing the evidence on right to counsel grounds. *See Kuhlmann*, 477 U.S. at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384–85. The state should not be prohibited from using evidence it discovers "by luck or happenstance." *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487, 88 L. Ed. 2d at 496.

Finally, there are questions of proof. As one authority has stated, "[i]n-custody confessions are often easy to allege and difficult, if not impossible, to disprove." Fred Kaufman, *Report of the Kaufman Commission on Proceedings Involving Guy Paul Morin* (Robert N. Moles, ed. Mar. 1998), http://netk.net.au/Canada/Morin22.asp; *see also* Fred Kaufman, *The Commission on Proceedings Involving Guy Paul Morin: Executive Summary* 9–14 (1998), http://www.attorneygeneral.jus.gov.on. ca/english/about/pubs/morin/morin_esumm.pdf; Covey, 49 Wake Forest L. Rev. at 1380. The problem of proof, along with questions of reliability, have given rise to requiring some corroboration of jailhouse informant testimony to support a conviction in at least eighteen states. Covey, 49 Wake Forest L. Rev. at 1416–20 (describing the various states' corroboration requirements); *see* Am. Bar Ass'n Section of Criminal Justice, *Report to the House of Delegates* 1, 6–7 & n.16 (Feb. 2005) http://www.americanbar.org/content/dam/aba/publishing/criminal_ju stice_section_newsletter/crimjust_policy_my05108b.authcheckdam.pdf.

**B. Positions of the Parties.** Marshall argues the record establishes that the State violated *Massiah* by employing informants to violate his right to counsel. He stresses that Johnson was operating under a proffer agreement, that the State conceded Johnson was trying to provide information that would be used to determine what reduction in sentence he would receive, and that the State provided Johnson with a list of suspects. Marshall notes that Johnson initiated the conversation about the crime when Johnson "asked him what was he in . . . for." According to Marshall, Johnson was "deputized" to provide incriminating information on him.

With respect to Martin and Freeman, Marshall recognizes that it is less clear that they were serving as agents of the State at the time they

received incriminating information from Marshall. Marshall argues, however, that the State "must have known" that Johnson would pass on the State's interest in him to Johnson's coconspirator and coinformant, Martin, who was also incarcerated at the Muscatine County Jail and had provided information to Detective Smithey in the past under a cooperation agreement. Marshall points out that Detective Smithey testified that it was probably reasonable to assume that Johnson was going to pass the information request on to Martin. Marshall finds it an extraordinary coincidence that after Detective Smithey met with Johnson on October 3 he happened to run into Martin, who also happened to have extensive notes on a legal pad written by Marshall.

Marshall asserts that Martin lied at trial by stating that he did not know Detective Smithey prior to providing information on Marshall when, in fact, Detective Smithey was well acquainted with Martin. Detective Smithey testified that he had interviewed Martin in connection with Martin's proffer agreement "on several occasions, two or more . . . prior to that date." Freeman, in turn, was enlisted by Martin. Marshall notes that Freeman testified that Martin and another inmate named Sandifer sent Marshall to him. Freeman and Martin then extensively infiltrated Marshall and his lawyer's attorney–client relationship by providing what amounted to legal advice on how to prepare his defense and how to present it to Marshall's lawyer.

Marshall asserts that under *Massiah* and its progeny there is no requirement that Johnson be given specific instruction regarding how to obtain information. He notes that in *Henry*, the informant was specifically told not to initiate any conversations. *See* 447 U.S. at 266, 100 S. Ct. at 2184–85, 65 L. Ed. 2d at 119. Yet the *Henry* Court found a *Massiah* violation because the state "must have known" that the

informant would initiate conversations in light of the incentives to obtain the information. *Id.* at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122. Marshall claims these principles were reaffirmed in *Moulton.* *See* 474 U.S. at 176, 106 S. Ct. at 487, 88 L. Ed. 2d at 496.

Marshall then addresses the most recent United States Supreme Court case, *Kuhlmann.* Marshall contends that in *Kuhlmann,* the Supreme Court "fudged" when it stated that the only remark made by the informant was that Kuhlmann's position on the crimes "didn't sound too good." 477 U.S. at 460, 106 S. Ct. at 2630, 91 L. Ed. 2d at 385. Marshall points out that the informant in *Kuhlmann* in fact said that the defendant "better come up with a better story than that," a fact noted in a footnote and then disregarded in *Kuhlmann.* *Id.* at 440 n.1, 106 S. Ct. at 2619 n.1, 91 L. Ed. 2d at 372 n.1. Marshall cites Justice Brennan's dissent in *Kuhlmann,* which stressed the failure of the majority to consider the full facts, including the statement cited by Marshall and the fact that the informant was placed in a jail cell with the defendant with a view of the scene of the crime. *Id.* at 473, 106 S. Ct. at 2637, 91 L. Ed. 2d at 393–94 (Brennan, J., dissenting). The bottom line for Marshall is that he was surrounded by a "tangled web" of informers and that the incriminating statements made to them should be suppressed under *Massiah* and its progeny.

The State responds by asserting that the evidence in the case does not establish that the informants were acting as government agents and does not establish that they deliberately elicited the incriminating statements from Marshall. On the question of agency, the State—citing *Moore* and other cases—asserts that there must be instructions to seek information about a "particular defendant." *Moore,* 178 F.3d at 999 (quoting *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir. 1997)). In

*Henry*, according to the State, the informant was acting on instructions from the police. *See* 447 U.S. at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122. Since the record is devoid of such instruction, neither Johnson, Martin, nor Freeman, according to the State, were agents. In addition, there was no promise of pay for successfully obtaining information. Therefore, according to the State, Johnson, Freeman, and Martin cannot be considered agents of the State.

The State challenges Marshall's argument that the State "must have known" that Johnson would tell others, including Freeman and Martin, about the State's interest in information about the Versypt murder. The State emphasizes that Johnson testified that he never talked with Martin about Marshall, and Freeman testified that he never spoke with Johnson about the Marshall matter. The State also argued that Marshall failed to show "deliberate elicitation" under *Kuhlmann.* According to the State, the record shows that the informants were acting as "listening posts" under *Kuhlmann.* 477 U.S. at 456 & n.19, 106 S. Ct. at 2628 & n.19, 91 L. Ed. 2d at 382 & n.19 (majority opinion). Noting that under *Kuhlmann,* the "primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation," *id.* at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384, the State argues that the defendant has failed to show deliberate elicitation.

In the alternative, the State argues that some of the interactions between the State and Johnson occurred before Johnson's Sixth Amendment rights attached. Yet the State acknowledges that in the proceedings below, the county attorney agreed with the district court that the right had attached prior to the time when the informants interacted with the defendants.

**C. United States Supreme Court's Approach to the Use of Government Informants Against Defendants Represented by Counsel.** There are four important United States Supreme Court cases that establish a general framework for determining when the use of government informants violates the accused's Sixth Amendment right to counsel. The first case is *Massiah*, 377 U.S. at 201, 84 S. Ct. at 1199, 12 L. Ed. 2d at 246. In *Massiah*, the Supreme Court considered a case where a government agent deliberately elicited information from a criminal defendant. *Id.* at 203–04, 84 S. Ct. at 1201, 12 L. Ed. 2d at 249. A confederate of a defendant—who was on bail and had obtained legal representation—agreed to allow federal authorities to place a radio transmitter in the front seat of his car. *Id.* at 202–03, 84 S. Ct. at 1201, 12 L. Ed. 2d at 248. Federal authorities sat in a car down the street and listened to the conversation between the confederate and the defendant. *Id.* at 203, 84 S. Ct. at 1201, 12 L. Ed. 2d at 248–49. The defendant "made several incriminating statements during the course of the conversation." *Id.* at 203, 84 S. Ct. at 1201, 12 L. Ed. 2d at 249. These incriminating conversations were introduced into evidence at trial. *Id.*

The Supreme Court held that the incriminating conversations were inadmissible. *Id.* at 207, 84 S. Ct. at 1203, 12 L. Ed. 2d at 251. According to the Court, the defendant was denied the basic protections of the Sixth Amendment right to counsel by use of his own incriminating words, "which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S. Ct. at 1203, 12 L. Ed. 2d at 250.

After *Massiah*, the Supreme Court decided *Henry*, 447 U.S. at 264, 100 S. Ct. at 2183, 65 L. Ed. 2d at 115. In that case, the informant Nichols advised an FBI agent that he had been placed in the same

cellblock as the defendant Henry, who had been accused of participating in a bank robbery. *Id.* at 266, 100 S. Ct. at 2184, 65 L. Ed. 2d at 119. After Nichols was released from jail, Nichols told the FBI agent that "he and Henry had engaged in conversation and that Henry told him about the robbery." *Id.* at 266, 100 S. Ct. at 2185, 65 L. Ed. 2d at 119.

At trial, Nichols testified that he had "an opportunity to have some conversations with Mr. Henry while he was in the jail" and that Henry had told him that he had participated in the robbery. *Id.* at 267, 100 S. Ct. at 2185, 65 L. Ed. 2d at 120. After the evidence was admitted and the defendant convicted, an appellate court reversed and remanded for an evidentiary inquiry into "whether the witness . . . was acting as a government agent during his interviews with Henry." *Id.* at 268, 100 S. Ct. at 2185, 65 L. Ed. 2d at 120. At the subsequent evidentiary hearing, the FBI agent submitted an affidavit which stated,

> I recall telling Nichols at this time to be alert to any statements made by these individuals [the federal prisoners] regarding the charges against them. I specifically recall telling Nichols that he was not to question Henry or these individuals about the charges against them, however, if they engaged him in conversation or talked in front of him, he was requested to pay attention to their statements.

*Id.* at 268, 100 S. Ct. at 2186, 65 L. Ed. 2d at 121. In addition, the FBI agent's affidavit also stated that he never requested anyone to place Nichols in the same cell with Henry. *Id.* The district court affirmed Henry's conviction. *Id.* The court of appeals reversed, indicating that "by general conversation . . . Nichols had developed a relationship of trust and confidence with Henry such that Henry revealed incriminating information." *Id.* at 269, 100 S. Ct. at 2186, 65 L. Ed. 2d at 121.

Citing *Massiah*, the Court focused on the question of whether the government deliberately elicited incriminatory statements from the

defendant. *Id.* at 270, 100 S. Ct. at 2186, 65 L. Ed. 2d at 122. In finding deliberate elicitation, the *Henry* Court cited three facts. *Id.* First, Nichols was acting under government instructions as a paid informant. *Id.* at 270, 100 S. Ct. at 2186–87, 65 L. Ed. 2d at 122. Second, Nichols appeared to be no more than a fellow inmate of Henry. *Id.* at 270, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122. Third, "Henry was in custody and under indictment at the time he was engaged in conversations by Nichols." *Id.* The *Henry* Court also noted that Nichols was operating on a contingency-fee arrangement. *Id.* The Court concluded, "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id.* at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122. The *Henry* Court also rejected the government's defense that the agents instructed Nichols not to question Henry about the robbery. *Id.* at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122–23. The Court noted, "Nichols was not a passive listener; rather, he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.' " *Id.*

The *Henry* Court further noted that no inquiry was made in *Massiah* "as to whether Massiah or his codefendant first raised the subject of the crime under investigation." *Id.* at 271–72, 100 S. Ct. at 2187, 65 L. Ed. 2d at 123. The Court emphasized that conversations with a fellow inmate who is acting as a government informant "may elicit information that an accused would not intentionally reveal to persons known to be Government agents." *Id.* at 273, 100 S. Ct. at 2188, 65 L. Ed. 2d at 124. What the police must not do, according to *Henry*, is engage in deliberate elicitation, which the Court defined as "intentionally

creating *a situation* likely to induce [a person] to make incriminating statements without the assistance of counsel." *Id.* at 274, 100 S. Ct. at 2189, 65 L. Ed. 2d at 125 (emphasis added).

The Court did not provide a precise formula for determining when "a situation" likely to induce a person to make incriminating statements without the assistance of counsel is present. *Henry*, however, cited three factors: (1) the informant acted under instructions as a paid informant for the government, (2) the informant appeared to be just another inmate, and (3) the defendant was in custody and under indictment at the time the informant engaged him in conversation. *Id.* at 270, 100 S. Ct. at 2186–87, 65 L. Ed. 2d at 122. The *Henry* Court seemed to emphasize the fact that Nichols and Henry shared facilities and that Nichols had ingratiated himself through his "conduct and apparent status as a person sharing a common plight." *Id.* at 274, 100 S. Ct. at 2189, 65 L. Ed. 2d at 124. Yet the Court explicitly left open the question of whether there can be deliberate elicitation when the government informer, though planted, is wholly passive. *Id.* at 271 n.9, 100 S. Ct. at 2187 n.9, 65 L. Ed. 2d at 123 n.9.

While five members joined the majority opinion, Justice Powell wrote a concurring opinion in *Henry*. Justice Powell emphasized that *Massiah* requires deliberate elicitation. *Id.* at 275, 100 S. Ct. at 2189, 65 L. Ed. 2d at 125 (Powell, J., concurring). Justice Powell stressed that *Massiah* did not apply to passive listening devices that merely collect, but do not induce, incriminating statements. *Id.* at 276, 100 S. Ct. at 2190, 65 L. Ed. 2d at 126. Justice Powell further stated that "the mere presence of a jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional." *Id.*

In *Moulton,* an informant met with the defendant—his accomplice—and repeatedly asked the defendant to remind him of the details of the crime and encouraged the defendant to describe his plan for killing witnesses. 474 U.S. at 165–66, 106 S. Ct. at 481–82, 88 L. Ed. 2d at 489. The Court explained that the informant engaging the defendant in active conversation about the upcoming trial was virtually certain to elicit incriminating statements. *Id.* at 177 n.13, 106 S. Ct. at 487 n.13, 88 L. Ed. 2d at 496 n.13. The *Moulton* Court emphasized "[t]he Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek [the assistance of counsel]." *Id.* at 171, 106 S. Ct. at 484, 88 L. Ed. 2d at 492. The Court also acknowledged that "[d]irect proof of the State's knowledge will seldom be available to the accused." *Id.* at 176 n.12, 106 S. Ct. at 487 n.12, 88 L. Ed. 2d at 496 n.12.

In *Kuhlmann,* the Supreme Court considered a second federal habeas corpus petition brought by a state prisoner who claimed a *Massiah* violation. 477 U.S. at 438, 441, 106 S. Ct. at 2619–20, 91 L. Ed. 2d at 371–73. The defendant Wilson was accused of robbery and murder in connection with a robbery of a taxicab garage that led to the death of a night dispatcher. *Id.* at 438–39, 106 S. Ct. at 2619, 91 L. Ed. 2d at 371. After arraignment, Wilson was incarcerated in the Bronx House of Detention. *Id.* at 439, 106 S. Ct. at 2619, 91 L. Ed. 2d at 371. Unbeknownst to Wilson, a detective had obtained an agreement from Lee, Wilson's cellmate, to be an informant. *Id.* The government wanted to learn who participated in the crime with Wilson. *Id.* at 439, 106 S. Ct. at 2619, 91 L. Ed. 2d at 371–72. The *Kuhlmann* Court noted that Lee was instructed simply to "keep his ears open" for the names of persons who participated in the crimes with Wilson. *Id.* at 439, 106

S. Ct. at 2619, 91 L. Ed. 2d at 372. When Wilson observed that their cell had a view of the taxicab garage where the crimes occurred, he declared, "someone's messing with me," and narrated his version of events that he had already told police. Lee responded that his explanation "didn't sound too good." *Id.* at 439–40, 106 S. Ct. at 2619, 91 L. Ed. 2d at 372. Later, Wilson changed his story, admitting that he and two others had committed the robbery and murdered the dispatcher. *Id.* at 440, 106 S. Ct. at 2619–20, 91 L. Ed. 2d at 372.

At a hearing in the original state court proceeding, the detective and Lee testified. *Id.* at 440, 106 S. Ct. at 2620, 91 L. Ed. 2d at 372. The detective testified that he had instructed Lee "to ask no questions" about the crime "but merely . . . listen" to what Wilson might say about the crime. *Id.* After hearing from Lee, the state trial court found, as a matter of fact, that Lee obeyed his instructions and only listened and made notes regarding what Wilson had to say. *Id.* The state trial court found respondent's statements were spontaneous and unsolicited. *Id.* After Wilson lost the appeal, he filed his first federal habeas corpus petition challenging the introduction of Lee's testimony on *Massiah* grounds. *Id.* at 441, 106 S. Ct. at 2620, 91 L. Ed. 2d at 372–73. The federal court denied relief and a divided court of appeals affirmed. *Id.* at 441, 106 S. Ct. at 2620, 91 L. Ed. 2d at 373; *see Wilson v. Henderson*, 584 F.2d 1185, 1192 (2d Cir. 1978).

After the Supreme Court decided *Henry*, however, Wilson filed a motion to vacate his conviction in state court. *Kuhlmann*, 477 U.S. at 442, 106 S. Ct. at 2620–21, 91 L. Ed. 2d at 373. The state court denied relief on the ground that *Henry* was factually distinguishable and that under state law *Henry* was not retroactive. *Id.* at 442, 106 S. Ct. at 2621, 91 L. Ed. 2d at 373. Wilson then filed his second federal habeas

corpus petition, arguing that *Henry* enunciated a new rule of law that should be retroactively applied to his case. *Id.* The federal district court again denied relief. *Id.* at 442, 106 S. Ct. at 2621, 91 L. Ed. 2d at 373–74. The federal district court noted that the state trial court's findings of fact were presumptively correct in a federal habeas corpus proceeding and were fully supported by the record. *Id.* at 443, 106 S. Ct. at 2621, 91 L. Ed. 2d at 374. The federal court emphasized that under the facts as found by the state court, Lee made "no affirmative effort" of any kind "to elicit information" from the respondent. *Id.*

Wilson appealed and another divided panel of the Second Circuit reversed. *Id.*; *see Wilson v. Henderson*, 742 F.2d 741, 745 (2d Cir. 1984). Among other things, the majority found that the facts of the case were indistinguishable from *Henry* and that *Henry* was fully applicable because it did not announce a new constitutional rule but merely applied settled principles to new facts. *Kuhlmann*, 477 U.S. at 443, 106 S. Ct. at 2621, 91 L. Ed. 2d at 374 (citing *Wilson*, 742 F.2d at 746–47). The Supreme Court granted certiorari. *Id.* at 444, 106 S. Ct. at 2621, 91 L. Ed. 2d at 374.

In *Kuhlmann*, the majority concluded that there was no *Massiah* violation. *Id.* The *Kuhlmann* majority noted that in *Henry* the informant "developed a relationship of trust and confidence with [the defendant] such that [the defendant] revealed incriminating information." *Id.* at 458, 106 S. Ct. at 2629, 91 L. Ed. 2d at 383–84 (quoting *Henry*, 447 U.S. at 269, 100 S. Ct. at 2186, 65 L. Ed. 2d at 121). The *Kuhlmann* Court further noted that in *Henry* the informant had stimulated conversations with the defendant in order to elicit incriminating information. *Id.* at 458, 106 S. Ct. at 2629, 91 L. Ed. 2d at 384. The *Kuhlmann* majority emphasized that the defendant must demonstrate that "police and their

informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384–85.

The Court also emphasized that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Id.* at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384–85. Because in *Kuhlmann* the police deliberately placed the informant in the cell with the defendant, the *Kuhlmann* majority appeared to answer the question posed in a footnote in *Henry*—namely, whether mere placement of an informant alone in a cell with the defendant was enough to give rise to a Sixth Amendment violation. *Id.* at 456, 106 S. Ct. at 2628, 91 L. Ed. 2d at 382–83.

The *Kuhlmann* Court then considered whether there was deliberate elicitation under the circumstances of the case. *Id.* at 460–61, 106 S. Ct. at 2630–31, 91 L. Ed. 2d at 385. The Court found that the Second Circuit failed to give appropriate deference in the federal habeas corpus proceeding to the factual findings of the state court. *Id.* at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 385. The Court noted that the state court found the detective had instructed Lee "only to listen" to Wilson and that respondent's comments were spontaneous and unsolicited. *Id.* at 460, 106 S. Ct. at 2630, 91 L. Ed. 2d at 385. The *Kuhlmann* majority found that these state court findings were entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 385. The Court found that the Second Circuit had revised some of the trial court's findings and that its conclusions were at odds with the factual findings of the state court. *Id.* at 460, 106 S. Ct. at 2630, 91 L. Ed. 2d at 385.

Justice Brennan, along with Justices Marshall and Stevens, dissented. *Id.* at 461, 106 S. Ct. at 2631, 91 L. Ed. 2d at 386 (Brennan, J., dissenting); *id.* at 476, 106 S. Ct. at 2639, 91 L. Ed. 2d at 396 (Stevens, J., dissenting). According to Justice Brennan, the Court in *Henry* found incriminating statements were deliberately elicited when a jailhouse informant followed instructions to obtain information without directly questioning Henry and without initiating conversations concerning the charges pending against Henry. *Id.* at 474, 106 S. Ct. at 2637–38, 91 L. Ed. 2d at 394 (Brennan, J., dissenting). Justice Brennan noted that in *Henry,* it was irrelevant that the informant asked pointed questions about the crime or "merely engage[d] in general conversation about it." *Id.* at 474, 106 S. Ct. at 2638, 91 L. Ed. 2d at 394 (quoting *Henry,* 447 U.S. at 272 n.10, 100 S. Ct. at 2187 n.10, 65 L. Ed. 2d at 123 n.10 (1980)).

Justice Brennan emphasized that in *Henry,* the Court stressed the importance of three factors: (1) whether the informant was a paid informant, (2) whether the defendant was aware that there was an informant in his presence, and (3) whether the accused was in custody at the time of made incriminating statements. *Id.* at 475, 106 S. Ct. at 2638, 91 L. Ed. 2d at 394–95. Justice Brennan found that all three of these factors were met in *Kuhlmann.* *Id.* at 475–76, 106 S. Ct. at 2638–39, 91 L. Ed. 2d at 395–96. Justice Brennan also cited the fact that the jail cell had a visual view of the taxicab garage where the crime occurred and that the informant in essence gave the defendant advice to improve his story. *Id.* at 476, 106 S. Ct. at 2638, 91 L. Ed. 2d at 395. In his view, "[t]he State intentionally created a situation in which it was foreseeable that respondent would make incriminating statements without the assistance of counsel . . . ." *Id.* Justice Brennan argued that

the informant, "while avoiding direct questions, nonetheless developed a relationship of cellmate camaraderie with the respondent and encouraged him to talk about his crime." *Id.* He found a sufficient nexus between the state's actions and the admissions of guilt to constitute deliberate elicitation within the meaning of *Henry*. *Id.* at 476, 106 S. Ct. at 2638–39, 91 L. Ed. 2d at 395–96.

After *Kuhlmann*, the question arose whether its language regarding what constituted deliberate elicitation should be interpreted as a limitation on the expansive view provided in *Henry*. *See, e.g.*, Craig Bradley, *What's Left of* Massiah*?*, 45 Tex. Tech L. Rev. 247, 260–61 (2012); Tomkovicz, *Adversary System*, 22 U.C. Davis L. Rev. at 19–20. On the one hand, *Henry* was not expressly overruled in *Kuhlmann*. Further, many of the concepts of *Henry* were cited with approval in *Kuhlmann*. *See Kuhlmann*, 477 U.S. at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384 (majority opinion). Additionally, *Kuhlmann* arose in the context of a federal habeas corpus challenge to a state court conviction. Because *Kuhlmann* essentially held for the state on procedural grounds unrelated to the Sixth Amendment, *id.* at 455, 106 S. Ct. at 2627–28, 91 L. Ed. 2d at 382, the subsequent discussion of *Henry* could be regarded as mere dicta.

On the other hand, as pointed out by Justice Brennan, the facts of *Kuhlmann* seemed strikingly similar, if not indistinguishable, to *Henry*. *Kuhlmann*, 477 U.S. at 473, 106 S. Ct. at 2637, 91 L. Ed. 2d at 394 (Brennan, J., dissenting). One could argue that the only way the state could have violated Henry's Sixth Amendment rights but not Wilson's was if there was a modification of law in *Kuhlmann*. *See* Bruce D. Lundstrom, *Sixth Amendment—Right to Counsel: Limited Postindictment*

*Use of Jailhouse Informants Is Permissible*, 77 J. Crim. L. & Criminology 743, 764–65 (1986).

Yet in reading the majority and dissenting opinions, they both appear to accept the deliberate-elicitation framework. The facts, however, are viewed differently. The majority considered the informant to be passive, while the dissent suggested that the informant took an active role by stimulating conversation about the crime and by suggesting that the defendant develop a more convincing story. *See* April Leigh Ammeter, Kuhlmann v. Wilson*: 'Passive' and 'Active' Government Informants: A Problematic Test*, 72 Iowa L. Rev. 1423, 1435 (1987) [hereinafter Ammeter]. As noted by one commentator, the debate between the majority in *Kuhlmann* and Justice Brennan's dissent is "a demonstration of the morass into which the Court's chosen path can lead a conscientious judge." H. Richard Uviller, *Evidence from the Mind of the Criminal Suspect: A Reconsideration of the Current Rules of Access and Restraint*, 87 Colum. L. Rev. 1137, 1194 (1987).

### D. **Application of *Massiah* and Its Progeny in Lower Courts.**

1. *Introduction.* Applying the principles of *Massiah* and its progeny has been a challenge in the lower courts. Courts frequently cite the conflicts in the cases and the lack in clarity of the applicable legal standards. *See, e.g.*, *United States v. LaBare*, 191 F.3d 60, 64 (1st Cir. 1999) ("[W]hile these legal premises are clear, their application to this case is less than straightforward."); *Leopardi*, 701 A.2d at 956 ("[C]andor requires us to confess our difficulty in reconciling several of these decisions."). Many of the cases are not unanimous. *See, e.g.*, *Johnson*, 338 F.3d at 923 (Bye, J., dissenting); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 905 (3d Cir. 1999) (McKee, J., concurring) (finding Sixth Amendment analysis contrary to *Massiah* but error harmless);

*Lightbourne v. Dugger*, 829 F.2d 1012, 1027 (11th Cir. 1987) (Anderson, J., concurring in part and dissenting in part); *United States v. Taylor*, 800 F.2d 1012, 1018 (10th Cir. 1986) (McKay, J., dissenting); *State v. Currington*, 746 P.2d 997, 1005 (Idaho Ct. App. 1987) (Swanstrom, J., dissenting); *Commonwealth v. Franciscus,* 710 A.2d 1112, 1122 (Pa. 1998) (Castille, J., dissenting); *Hartman v. State*, 896 S.W.2d 94, 107 (Tenn. 1995) (Reid, J., concurring and dissenting); *State v. Leadingham*, 438 S.E.2d 825, 839 (W. Va. 1993) (Workman, C.J., dissenting).

2. *Requirement of informant agency.*

a. *Introduction.* For the activities of an informant to give rise to a Sixth Amendment violation, the informant must be acting as an agent for the government. *Henry*, 447 U.S. at 270, 100 S. Ct. at 2186–87, 65 L. Ed. 2d at 122. When the government and an informant have an express agreement, often reduced to writing, there may be little question that the informant should be regarded as an agent of the government for Sixth Amendment purposes. But the question arises whether a jailhouse informant may be considered an agent for Sixth Amendment purposes in the absence of an express agreement. Even if we accept a theory of implied agency, one may wonder where the line is to be drawn between an implied agency relationship and jailhouse "entrepreneurs" who seek to improve their prospects by offering information to the state in the "jailhouse marketplace" of informant testimony. The cases have struggled to make this important distinction.

Irrespective of the above, it seems clear from the cases that agency under *Massiah* does not rely too heavily on traditional principles of private contract or agency law, but instead seems closer to the doctrine of state action. The question, for constitutional purposes, is whether the actions of an informant may be fairly attributed to the state.

Nonetheless, the cases suggest, "At a minimum . . . there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." *Depree v. Thomas*, 946 F.2d 784, 794 (11th Cir. 1991). The test for agency is a multifactored one based on all the facts and circumstances and not subject to clear maxims or bright-line rules.

b. *Express or implied agency.* There is some authority that seems to require a formal express agreement before an informant may be considered an agent of the state. *Lightbourne*, 829 F.2d at 1020 (majority opinion). Most of the caselaw, however, has drifted away from such formalism. There is ample authority for the proposition that the required agency may be express or implied. *See, e.g., Ayers v. Hudson*, 623 F.3d 301, 311 (6th Cir. 2010); *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004); *Matteo*, 171 F.3d at 893 (majority opinion); *United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994); *Depree*, 946 F.2d at 794; *United States v. York*, 933 F.2d 1343, 1357 (7th Cir. 1991), *overruled on other grounds by Wilson v. Williams,* 182 F.3d 562, 567 (7th Cir. 1999); *Thomas v. Cox*, 708 F.2d 132, 136 (4th Cir. 1983).

State courts have also embraced the notion of implied agency. *See, e.g., McBeath v. Commonwealth*, 244 S.W.3d 22, 33 (Ky. 2007) (holding it is not necessary to have quid pro quo understanding in order to find agency); *Commonwealth v. Foxworth*, 40 N.E.3d 1003, 1012 (Mass. 2015) (requiring "evidence of a promise, express or implied" to find agency). *Moulton* advises that the state has an affirmative duty to ensure that the defendant's right to counsel is honored. 474 U.S. at 171, 106 S. Ct. at 484, 88 L. Ed. 2d at 492–93. This affirmative duty cannot be met when the state enters into somewhat vague agreements with informants that predictably lead to interference with the right to counsel. Thus, the real

question at issue in the better-reasoned cases is not whether agency may be implied, but rather what must be shown to establish implied agency.

In addition, it is important to point out that the question of agency is a dynamic concept. For instance, in *Wesbrook v. State*, an inmate reported conversations to state authorities in which the defendant expressed a desire to kill his ex-wife and her husband. 29 S.W.3d 103, 116 (Tex. Crim. App. 2000). The inmate arranged a meeting with authorities, hoping to exploit the information for his benefit. *Id.* After receiving the information, the authorities then entered into an agreement with the inmate to elicit more information in exchange for a good word with the prosecution on the inmate's pending charges. *Id.* The court allowed the testimony on information obtained prior to the first meeting with the authorities, but suppressed information gathered afterwards on *Massiah* grounds. *Id.* at 119.

c. *Requirement of express or implied instructions. Moulton* and *Henry* make clear that the existence of instructions not to ask questions of a defendant are not determinative on the issue of whether a *Massiah* violation has occurred. *Moulton*, 474 U.S. at 177 n.14, 106 S. Ct. at 488 n.14, 88 L. Ed. 2d at 497 n.14; *Henry*, 447 U.S. at 271–72, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122–23. Such limitations are insufficient because failure to follow instructions is foreseeable in light of the strong incentives that motivate a jailhouse informant. *Henry*, 447 U.S. at 270–71 & n.7, 100 S. Ct. at 2187 & n.7, 65 L. Ed. 2d at 122 & n.7. Nonetheless, the slightly different question of whether explicit instructions are required in order to establish agency, express or implied, for purposes of the Sixth Amendment has sometimes reoccurred in the caselaw.

For instance, in *Johnson,* the Eighth Circuit found that the informant was not instructed, by express words or implication, to gather information about a defendant. 338 F.3d at 921 (majority opinion). Thus, according to the *Johnson* majority, there was no express or implied agency. *Id.* A dissent in *Johnson* disagreed, however, and concluded that agency should not be limited to cases where the government gives an informant direct, explicit oral or written instructions. *Id.* at 925–26 (Bye, J., dissenting). According to the dissent, the record established that the informant did not need for the instructions to be spelled out. *Id.* The dissent emphasized that the government did not obtain statements "by luck or happenstance" but as the result of a meeting purposefully arranged by the prosecutor to "circumvent[ ] the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.* at 926 (quoting *Robinson v. Clarke,* 939 F.2d 573, 576 (8th Cir. 1991) (second quote)) (alteration in original).

The formalism of the majority in *Johnson* seems inconsistent with the "likely to induce" standard in *Henry* and has been rejected by a number of courts. 447 U.S. at 274, 100 S. Ct. at 2189, 65 L. Ed. 2d at 125. As noted by the Eleventh Circuit, "There is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the [S]ixth [A]mendment right to counsel." *Depree,* 946 F.2d at 793–94. The Sixth Circuit has also rejected the *Johnson* approach, noting that if explicit instructions were required to establish agency for Sixth Amendment purposes, the state could accomplish "with a wink and a nod" what it cannot overtly do. *Ayers,* 623 F.3d at 312. The Third and Fourth Circuits have come to similar conclusions. *See Matteo,* 171 F.3d at 893; *Brink,* 39 F.3d at 424; *Cox,* 708 F.2d at 136.

One state court case dramatically illustrates the shortcomings of a formalistic *Johnson* approach. In *Commonwealth v. Moose*, the Pennsylvania Supreme Court considered a case where the informant did not have specific instructions. 602 A.2d 1265, 1270 (Pa. 1992). Yet the record demonstrated that the informant knew what to do. *Id.* Indeed, the informant was called "the monsignor" because so many inmates confessed to him. *Id.* Notwithstanding the lack of instructions, the informant was an agent of the state for Sixth Amendment purposes. *Id.* at 1271.

d. *Requirement of quid pro quo.* Some cases have considered whether an express or implicit quid pro quo is required to state a *Massiah* violation. In *McBeath*, the Kentucky Supreme Court stated it is not necessary to have an express quid pro quo agreement. 244 S.W.3d at 33. Similarly, the California Supreme Court has stated that an informant acts as a government agent if the informant acts "under the direction of the government pursuant to a preexisting arrangement, with the *expectation* of some resulting benefit or advantage." *People v. Coffman*, 96 P.3d 30, 83 (Cal. 2004) (emphasis added) (quoting *In re Neely*, 864 P.2d 474, 481 (Cal. 1993)); *see also Commonwealth v. Murphy*, 862 N.E.2d 30, 38, 40–41 (Mass. 2007); *Rubalcado v. State*, 424 S.W.3d 560, 575 (Tex. Crim. App. 2014).

In *Brink*, the court held that a lack of a specific promise was not determinative on the issue of agency for Sixth Amendment purposes. 39 F.3d at 424. Additionally, in *Randolph*, the court emphasized that it was enough that the state made a decision to obtain an informant's cooperation and that the informant decided to provide it. 380 F.3d at 1144. *Brink* and *Randolph* are consistent with *Henry*, which emphasized that with respect to agency, it is the likely result of the government's acts

that determines the issue. 447 U.S. at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122. Given the long prison sentences that many informants face, the prospect that cooperation might be considered in reducing a sentence is a sufficient inducement to support a *Massiah* violation.

e. *Distinction between informers and entrepreneurs.* Even if instructions are not necessarily required for express or implied agency, the cases generally draw a distinction between informants acting on behalf of the government and those who act without government involvement. *See Birbal*, 113 F.3d at 346. As stated in *Cox*, an inmate who volunteers information to authorities based on "an unencouraged hope to curry favor" does not offend *Massiah.* 708 F.2d at 136. The Delaware Supreme Court offered a similar viewpoint, noting that the Sixth Amendment "does not protect a defendant against private individuals who wish to profit at his expense." *Jackson v. State*, 684 A.2d 745, 752 (Del. 1996). Such persons, in the parlance of courts grappling with *Massiah* issues, are commonly referred to as entrepreneurs. *See York*, 933 F.2d at 1356.

In some cases, it is undisputed that the informer has no agency relationship with the government. For instance, in *LaBare*, one of the informants was "not even arguably a government agent" when he gathered incriminating statements. 191 F.3d at 66. Whether an informant has crossed the line between agency and entrepreneurship, however, depends on the facts. A number of cases have found, for instance, that what began as entrepreneurship may develop into an agency relationship. *See, e.g., Wesbrook*, 29 S.W.3d at 119. Sometimes, however, an entrepreneur who becomes an agent may still not violate *Massiah* if, in his subsequent contact with the defendant, he does not engage in acts of deliberate elicitation. *See Birbal*, 113 F.3d at 346.

f. *Requirement of specific target.* In some cases, courts have held that an informant becomes a government agent only when instructed by the government to get information about a particular defendant. *See LaBare*, 191 F.3d at 65; *Moore*, 178 F.3d at 999; *Birbal*, 113 F.3d at 346; *In re Benn*, 952 P.2d 116, 138–39 (Wash. 1998). Other courts, however, have come to a different conclusion and do not require targeting of specific individuals. *Brink*, 39 F.3d at 423–24; *York*, 933 F.2d at 1356–57; *United States v. Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980) (per curiam); *Murphy*, 862 N.E.2d at 40; *Moose*, 602 A.2d at 1270.

The problem with a requirement of a specific target is that it allows "informant[s] at large" to seek opportunities within the jailhouse at their discretion. *Sampol*, 636 F.2d at 638. The invasion of an incarcerated prisoner's Sixth Amendment rights is not affected by whether the informant is operating at large or with a specific target. As noted in *Moose*, "The vast majority of people in county jail are charged with crimes and awaiting trial . . . ." *Moose*, 602 A.2d at 1270. As a result, deliberately eliciting incriminating information from any of them violates *Massiah. Moose*, 602 A.2d at 1270.

As noted in *York*, the relationship between the state and its informers is often a symbiotic one. 933 F.2d at 1357. According to the *York* court, it would be inconsistent with the Sixth Amendment to allow the government to send out informants on "a reconnaissance patrol . . . to gather evidence." *Id.* at 1356. The court further noted "[w]hether the principal exercises its control strictly, by targeting specific individuals, or casually, by loosing an informant on the prison population at large, is irrelevant." *Id.* at 1357. A state's use of an at-large informant is at least somewhat inconsistent with the affirmative duty of prosecutors in

*Moulton* to avoid interference with the Sixth Amendment rights of defendants. 474 U.S. at 171, 106 S. Ct. at 484, 88 L. Ed. 2d at 492–93.

g. *Infiltration of cell.* There is authority for the proposition that placement of a friend or acquaintance with a defendant in the jailhouse is at least some evidence of agency. *See Matteo,* 171 F.3d at 894–95. Such action by the state "intentionally creat[es] a situation likely to induce [the accused] to make incriminating statements without the assistance of counsel" and is a significant factor to a finding of agency. *Id.* at 895 (quoting *Henry,* 447 U.S. at 274, 100 S. Ct. at 2189, 65 L. Ed. 2d at 125); *see also Brink,* 39 F.3d at 424 (placing informant in cell with pretrial detainee could represent a deliberate effort to obtain incriminating evidence in violation of Sixth Amendment). As noted in *Kimball,* if the state placed an informant back with the defendant after he expresses a willingness to cooperate, the state intentionally "creat[ed] a situation likely to induce" incriminating statements. *United States v. Kimball,* 884 F.2d 1274, 1278 (9th Cir. 1989). Under these circumstances, the government takes the risk that the informant will engage in deliberate elicitation. *See id.*

Yet there is authority for the proposition that mere placement of a person in a cell with a defendant, standing alone, is not sufficient to establish agency. *Taylor,* 800 F.2d at 1016 (majority opinion). Yet even in more cautious courts, the placement of an informant in a jail in proximity to a defendant, as in *Henry,* is a factor to be considered in determining whether the informant should be regarded as an agent of the state for Sixth Amendment purposes. *See, e.g., Henry,* 447 U.S. at 274, 100 S. Ct. at 2189, 65 L. Ed. 2d at 124; *Brink,* 39 F.3d at 424.

h. *Summary.* No talismanic test, mechanical checklist, or mathematical formula exists for determining whether an informant is an

agent for *Massiah* purposes. Instead, a court must determine—under all the facts and circumstances—whether the relationship between the state and an informant is such that the state has violated its affirmative duty under *Moulton* to protect the Sixth Amendment rights of defendants.

3. *Approach to deliberate elicitation.*

a. *Introduction.* A second important issue in the federal caselaw is the meaning of the elusive phrase "deliberate elicitation." Before exploring the meaning of the term, we must first note that it is clear that deliberate elicitation is not the same as an interrogation. *Fellers v. United States*, 540 U.S. 519, 524, 124 S. Ct. 1019, 1022–23, 157 L. Ed. 2d 1016, 1022–23 (2004); *see also Brewer*, 430 U.S. at 399, 97 S. Ct. at 1240, 51 L. Ed. 2d at 436–37 (stating that the detective "set out to elicit information from [the defendant] just as surely as—and perhaps more effectively than—if he had formally interrogated him"). Yet *Kuhlmann* suggests that "the primary concern" of *Massiah* and its progeny is to protect defendants from "secret interrogation by investigatory techniques that are the equivalent of police interrogation." 477 U.S. at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384.

In *Henry,* the Court seemed to embrace a three-part test to determine if the relationship between the government and the jailhouse informant was "likely" to elicit statements from a defendant in the absence of counsel. 447 U.S. at 270–71, 100 S. Ct. at 2186–87, 65 L. Ed. 2d at 122. The three prongs of the test were the relationship between the state and the informant, the fact that the informant and the defendant were both incarcerated, and the fact that the informant was under indictment. *Id.* There is nothing in *Henry* that requires a defendant to show what actually happened at the jailhouse between the informant and the defendant. Instead, the Court in *Henry* held the

creation of an environment likely to lead to elicitation was sufficient to establish the constitutional violation. *Id.* at 271–72, 100 S. Ct. at 2187, 65 L. Ed. 2d at 123. Yet in *Henry* it was clear that the informant engaged in some conversations with the defendant. *Id.* at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122–23.

In *Kuhlmann,* however, the Supreme Court focused more extensively on the deliberate-elicitation test. 477 U.S. at 459, 106 S. Ct. at 2629–30, 91 L. Ed. 2d at 384–85. There is language in *Kuhlmann* that seems to require that a defendant raising a *Massiah* challenge must specifically show that *the jailhouse informant* took active steps to elicit uncounseled statements by the defendant. *Id.* (stating that the defendant must show that "the police *and their informant* took some action" (emphasis added)). In short, under this theory of *Kuhlmann,* merely establishing that the state created an environment where elicitation of an uncounseled defendant was likely would not be sufficient. Under this more expansive view of *Kuhlmann,* the defendant must show, as a matter of fact, that the jailhouse informant was more than a "passive listener." Accordingly, under this understanding, active participation of some kind *by the informant* is required. An important issue under this reading of *Kuhlmann* is identifying what type of actions by a jailhouse informant are sufficient for a finding of deliberate elicitation and what actions may be regarded as merely incidental and constitutionally insignificant.

b. *Pure "listening post" cases.* There are occasions, of course, where the jailhouse informant merely overhears incriminating statements but does not participate *at all* in an interaction directly with the defendant. Where the evidence shows that the informant truly was a passive listening post—when he simply listened to conversations between

defendant and another inmate—courts do not find a Sixth Amendment violation. For instance, in *United States v. Mourad*, the court found no deliberate elicitation when the government agents overheard the defendant make incriminating statements to his wife on the telephone. 729 F.2d 195, 201 (2d Cir. 1984). This was a classic example of obtaining incriminating statements by luck or happenstance.

But the boundary between listening-post cases and cases involving deliberate elicitation is fraught with border disputes. For instance, consider two cases from Kentucky. In *Thurman v. Commonwealth*, the Kentucky Supreme Court concluded that the informant was, in fact, a passive listening post. 975 S.W.2d 888, 895–96 (Ky. 1998). But in *McBeath*, the Kentucky Supreme Court rejected a claim that an informant—who recorded statements by a defendant—acted as a passive listening post when the informant engaged in conversations about the offense and discussed trial strategy with the defendant. 244 S.W.3d at 29, 34.

In fact, in many cases where courts found the informants to be acting as listening posts, the informant was not literally silent but instead engaged in some communication with the defendant. The question in the caselaw is whether such communication was active or passive. *See Thomas*, 708 F.2d at 136 n.5; Ammeter, 72 Iowa L. Rev. at 1431–36.

c. *Requirement that informant initiate discussion leading to incriminating statements.* It is sometimes claimed that an informant must initiate the conversation about the crime in order to violate *Massiah* and its progeny. But *Henry* made clear a *Massiah* violation may occur even when the defendant initiates discussion of criminal conduct. *Henry*, 447 U.S. at 271–72, 100 S. Ct. at 2187, 65 L. Ed. 2d at 123; *Bey*

*v. Morton*, 124 F.3d 524, 530 (3d Cir. 1997). But deliberate elicitation is not a question of timing—it is a question of substance. Faithfulness to *Henry* requires that there be no escape from honoring the defendant's right to counsel simply because the informant initiates the discussion of the general subject matter of the crime. The better view is that there is no requirement that the informant begin the conversation if he or she subsequently encourages the defendant to provide additional incriminating information by his or her responses.

d. *Active vs. passive communication: responsive remarks.* Where informants literally do not take part in the conversation, but only listen, the cases are relatively easy. More difficult are situations where the jailhouse informants are not completely silent bystanders but have some degree of direct interaction with the defendant. The question then becomes, under the expansive view of *Kuhlmann*, whether the actions of the informant were active or passive. Sometimes the courts distinguish casual remarks from statements designed to deliberately elicit incriminating statements. In other cases, the courts distinguish responsive comments from more probing remarks.

For instance, in *McDonald v. Blackburn* the defendant returned from a meeting with police to his jail cell and declared to the jailhouse informant that police had "the ring." 806 F.2d 613, 618 (5th Cir. 1986). When the informant asked "what ring?" the defendant answered that it was the ring taken from the murder victim. *Id.* The Fifth Circuit found this simple response was not an action designed to deliberately elicit incriminating remarks. *Id.* at 622.

But a different result occurred in *Murphy*, 862 N.E.2d at 30. In that case, the informant questioned the defendant about "what he did about his anger toward the victim." *Id.* at 44. Plainly, unlike in

*McDonald*, this was not merely a response to the statement by the defendant, but was a question designed to enhance the substance of the communication between the defendant and the informant. *Id.* at 44–45. The Massachusetts Supreme Judicial Court found this statement was sufficient deliberate elicitation to trigger a *Massiah* violation. *Id.* at 46.

e. *Active or passive communication: clarifying questions.* *Matteo* is a case considering the question of whether responding to a defendant's statements by asking follow-up or clarifying questions amounts to deliberate elicitation under *Massiah*. 171 F.3d at 877. In *Matteo,* the defendant called the informant and asked him to retrieve the murder weapon for him. *Id.* at 881–82. In the first conversation initiated by the defendant, the defendant revealed the gun's general location. *Id.* at 882. During this conversation, the informant said virtually nothing at all. *Id.* at 882–83. The police, however, could not find the gun based upon the information volunteered by the defendant in the first conversation. *Id.* at 883. As a result, the police arranged for a second telephone conversation. *Id.* In the second conversation, the informant advised the defendant that he could not find the gun. *Id.* at 883–84. In the first conversation, the informant's responses included seventy-three one-word expressions such as "okay" and "yeah." *Id.* at 896 n.3. Nonetheless, during the second conversation, the informant asked some clarifying questions regarding the location of the gun:

> On the far side, on the side all the way closer to your home? . . . [I]s it in the water? . . . So it's not in the grass? . . . So it's almost underneath the bridge? . . . Was the water frozen when you dropped it?

*Id.* at 908 (McKee, J., concurring). The majority found that the clarifying questions were directly responsive to statements made by the defendant.

*Id.* at 896 (majority opinion). The court concluded there was no deliberate elicitation under *Kuhlmann.* *Id.* at 897.

Three judges, however, dissented on the issue of whether the Sixth Amendment was violated, but concurred in the result because of harmless error. *Id.* at 905 (McKee, J., concurring). According to these judges, the police directed the informant to obtain more information in the second conversation in order to find the gun. *Id.* at 908. The dissenters argued that the many monosyllabic answers did not transform the informant into a listening post when the very purpose of the second conversation was to find out more information about the location of the gun and the informant specifically asked questions designed to obtain greater details about its location. *Id.* at 909.

The issue of clarifying questions was also considered in *United States v. Jacques*, 684 F.3d 324, 330 (2d Cir. 2012). Here, in one of the conversations, when the defendant stated that the actual killers had planted evidence, the informant asked, "[W]hat did they do? What . . . kind of evidence?" *Id.* at 330 n.2 (alteration in original). Yet the court found no Sixth Amendment violation because the jailhouse informant was "entirely passive." *Id.* at 331–32. According to the court, the few follow-up questions posed by the informant were not "of a probing nature." *Id.* at 332. The court expressly reserved the question of whether limited follow-up questions could ever be found to stimulate discussion and thus be deliberate elicitation. *Id.*

A similar issue was confronted in *York*, 933 F.2d at 1343. In *York*, the informant and York were engaged in daily conversations, "kind of digging in each other's past." *Id.* at 1359. York told the informant that his son testified against him in his first trial and thought that York had killed his mother. *Id.* When the informant observed, "You must have

been pretty mad at the bitch," York declared, "Mad enough to put a bullet in the back of her head." *Id.* The court found the statement of the informant not sufficient to rise to the level of deliberate elicitation. *Id.* The court noted that informants are not required to reveal their status by not responding to subjects, to remove themselves from situations that might uncover incriminating information, or to abruptly change the subject when inmates unburden themselves. *Id.*

Other cases are more critical of follow-up questions. For example, in *Currington,* an Idaho appellate court rejected claims that the informant was acting as a mere listening post when the informant asked some twenty questions to follow up on statements made by the defendant. 746 P.2d at 1003–04 (majority opinion). Similarly, in *State v. Mattatall,* the informant asked questions of the defendant and then pressed him for "clarification of his equivocal responses." 525 A.2d 49, 52 (R.I. 1987). In these cases, follow-up questions were sufficient to trigger a *Massiah* violation.

f. *Active or passive communication: casual remarks.* Some cases seem to distinguish between casual remarks not designed to elicit incriminating statements and those that do. An illustrative case is *Commonwealth v. Hilton,* 823 N.E.2d 383 (Mass. 2005). In *Hilton,* a court officer was escorting a murder and arson defendant in leg irons after arraignment into a holding area. *Id.* at 391. The charges for which she was being arraigned stemmed from a blaze that destroyed a residence. *Id.* at 388, 391. The defendant stated that her son had warned her that leg irons were "no good." *Id.* at 391. The court officer asked the defendant who her son was. *Id.* In response, the defendant made the incriminating statement, "I hope he forgives me . . . . I could have killed my grandchildren." *Id.* At that point, the court officer asked the

defendant a series of questions about whether she had lit the fire, why she had done so, and whether she knew about the other occupants of the house. *Id.* The Massachusetts Supreme Judicial Court held that the court officer's question regarding the identity of the defendant's son was a causal remark not designed to elicit incriminating statements. *Id.* at 401. But the court officer's follow-up questions about the crime crossed the *Massiah* line and were properly suppressed. *Id.*

g. *Deliberate placement of informant with cellmate.* In *Kuhlmann*, the Supreme Court stated that the Sixth Amendment does not "forbid . . . admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" 477 U.S. at 456, 106 S. Ct. at 2628, 91 L. Ed. 2d at 382 (quoting *Henry*, 447 U.S. at 271 n.9, 100 S. Ct. at 2187 n.9, 65 L. Ed. 2d at 123 n.9) (alteration in original). Nonetheless, cases stress the role of the state in placing the informant in the jailhouse in a fashion designed to provoke discussion and potential incriminating statements. For instance, in *Brink*, the placement of an informant in close proximity to the defendant was a factor in determining agency. 39 F.3d at 424. On the other hand, in *Taylor*, the Tenth Circuit came to the conclusion that the mere placement of an informant in a jail cell with a defendant is insufficient to establish agency. 800 F.2d at 1016. *But see* Tomkovicz, *Adversary System*, 22 U.C. Davis L. Rev. at 79–81 (asserting when the government surreptitiously enters defendant's presence as a listener, it is not wholly passive and that *Massiah* should regulate passive reception).

h. *Affirmative acts to cultivate trust.* A number of the cases emphasize that when the informant engages in acts designed to encourage the defendant to trust the informant, these acts may at least

be a factor in determining whether deliberate elicitation occurred. For instance, in *Murphy*, the informant gained the trust of the defendant by helping him hide a shank. 862 N.E.2d at 44. Such trust-building activity contributes to the likelihood of obtaining incrimination information.

Yet in *State v. Robinson*, an informant prior to his arrest had worked with certain state agents. 448 N.W.2d 386, 390 (Neb. 1989). After the informant's arrest, he was placed in a corrections center where the defendant was also incarcerated. *Id.* The officers with whom the informant had the relationship had no role in his placement. *Id.* In the cellblock, the informant asked the defendant why he was in prison, to which the defendant responded that it was none of his business. *Id.* Later, the defendant asked the informant if there were some people he could contact to help raise bail money, which the informant said he would help with—an act designed to generate trust with the defendant. *Id.* The trial court, however, found these facts insufficient to establish active elicitation. The Nebraska Supreme Court affirmed. *Id.* at 396.

i. *Development of notes and written statements.* There are a handful of cases dealing with the development of written notes or documents by informants. In *United States v. Pannell,* an informant received listening-post instructions from law enforcement. 510 F. Supp. 2d 185, 188 (E.D.N.Y. 2007). The informant, however, took detailed, handwritten notes of incriminating information supplied by the defendant. *Id.* The district court did not believe that the informant followed the listening-post instructions, in part because of the detailed nature of the notes. *Id.* at 192. The district court noted that the informant must have participated in active conversation with the

defendant in a deliberate attempt to elicit incriminating remarks. *Id.* at 193.

A different result was reached in *Frederick v. State*, 755 N.E.2d 1078 (Ind. 2001). In that case, the informant's taking of notes, even if at the request of the police, was held not to violate Sixth Amendment rights if the informant did not elicit the information. *Id.* at 1082; *see also Commonwealth v. Harmon*, 573 N.E.2d 490, 493 (Mass. 1991) (finding the taking of notes about incriminating statements did not mean, under the facts and circumstances, that the note-taker was an agent of the state).

**E. Application of *Massiah* in Iowa Cases.** In *State v. Nelson*, a defendant made incriminating statements to a jailhouse informant. 325 N.W.2d 118, 119 (Iowa 1982). The informant then told authorities about the statements. *Id.* The informant was returned to his cell, where further incriminating statements were obtained from the defendant. *Id.* Citing the three-factor *Henry* test, we noted there was nothing to indicate that the state had "put him up to it." *Id.* at 119–20. Specifically, there was nothing to indicate that Jackson had an agreement that he would be paid or would receive more favorable treatment for the information. *Id.* at 120. No promises were made to give anything to the informant in exchange for incriminating statements. *Id.* We thus found, as a matter of fact, that the informant was not acting as an agent of the state. *Id.* We did not consider the question of deliberate elicitation.

**V. Discussion of Right-to-Counsel Issue.**

**A. Attachment.** The State contends that the right to counsel did not attach because the arrest warrant was not issued at the time that the State's officers met with Johnson on July 12. The critical time is not when the State met with Johnson or any other informant. The critical

time for purposes of attachment is when the informants obtained the incriminating information. *See Randolph,* 380 F.3d at 1143 ("*Once a defendant's Sixth Amendment right to counsel has attached,* the government is forbidden from 'deliberately eliciting' incriminating statements from the defendant." (Emphasis added.)). Here, there is no dispute that the right to counsel attached by then. Therefore, we reject the State's attachment argument.

**B. Agency Relationship.** We next consider whether the State had an agency relationship with its informants sufficient to support a *Massiah*-type claim. The court of appeals majority found such agency with respect to Johnson based on the totality of the circumstances and the dissent agreed.

1. *Johnson.* We think the record establishes an agency relationship existed as to Johnson. Whether a sufficient relationship exists between an informant and the state should not turn on formalistic analysis but on the more general proposition of whether an informant is seeking to provide information to the state in return for some kind of consideration. *Ayers,* 623 F.3d at 311–12. That was clearly the case here.

We do not regard the State's instructions, or lack of them, as preventing an agency relationship for *Massiah* purposes. In *Henry,* the state explicitly instructed the informant not to engage in questioning, but the failure of the informant to follow instructions did not mean an agency relationship was not present. 447 U.S. at 271–72, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122–23. Also in *Henry,* the Court emphasized the jailhouse setting as a circumstance creating especial danger of a Sixth Amendment violation, a concern fully applicable here. *Id.* at 273, 100 S. Ct. at 2188, 65 L. Ed. 2d at 124.

Yet as in *Henry*, we think the incentives for Johnson were sufficiently substantial that the State should know that there was a likelihood that the informant would cross the line into deliberate elicitation. Detective Smithey instructed Johnson to report back to him if he learned something. Given the powerful incentives plus the invitation to report back to Detective Smithey, Johnson was encouraged by the State to become a criminal investigator. If we took a contrary approach, we would promote a "wink and a nod" loophole to *Massiah*. *Ayers*, 623 F.3d at 312. We further note that Johnson, an inmate at the Muscatine County Jail, met with Detectives Smithey and Clarahan a day prior to Marshall's arrest. Marshall was then incarcerated in the same jail. The fact that Johnson obtained incriminating information from Marshall does not look like luck or happenstance.

We also reject the State's argument regarding the fact that the State officials asked for information about several persons of interest prevents us from finding an agency relationship between the State and Johnson. Whether the State seeks information about one person as in *Massiah* and *Kuhlmann* or three persons as here, the incentives for the informant remain precisely the same and the risks to the accused are no different than if there was just one target. We do not believe that the State can prevent the formation of an agency relationship by seeking information about multiple persons or by letting loose an informant at large in the jailhouse. We find the discussion in *York* persuasive. *See* 933 F.2d at 1356–57. We do not think the United States Supreme Court intended to allow the states to employ informants such as "the monsignor" to engage in wholesale violation of the right to counsel. *See Moose*, 602 A.2d at 1270. To do so would be contrary to the State's affirmative obligation to ensure that it does not take action that violates

or interferes with the relationship between a defendant and his counsel. *See Moulton*, 474 U.S. at 171, 106 S. Ct. at 484, 88 L. Ed. 2d at 492.

2. *Freeman.* Marshall has not, however, established an agency relationship between the State and Freeman on the present record. The record indicates that Freeman may have hoped to receive a benefit as a result from his testimony, but there is no evidence of a proffer agreement or any kind of meaningful relationship between Freeman and the State. *See Cox*, 708 F.2d at 136; *Jackson*, 684 A.2d at 752; *Nelson*, 325 N.W.2d at 120. Freeman was the classic entrepreneur, seeking to market his information without any advance arrangement. We reach this result as to Freeman even though he clearly deliberately elicited incriminating statements from Marshall. *Taylor*, 800 F.2d at 1016 (holding if the informant was not a government agent, no *Massiah* violation occurred even if there was deliberate elicitation).

3. *Martin.* Unlike Freeman, Detective Smithey testified that Martin had a proffer agreement. The evidence showed that Martin had provided information under the proffer agreement on two other occasions and that he remained in the Muscatine County Jail for a lengthy period of time prior to sentencing. Detective Smithey did not mention in direct examination that he met with Martin about the Versypt murder, but he conceded on cross-examination that he "may have asked him" if he had any information about the Versypt murder during one of his proffer interviews. Further, Martin and Johnson were codefendants, and Detective Smithey conceded that Johnson would probably pass on to Martin that the State was interested in obtaining information about Marshall's involvement in the Versypt murder. In other words, it was likely that the State's informant, Johnson, would pass the State's interest in Marshall on to his codefendant, who also had a cooperation

agreement and had previously provided information to the State on at least two occasions. After Marshall arrived at the Muscatine County Jail in August, Martin was moved into his cellpod. Curiously, then, after Detective Smithey met with Johnson on October 3 at the Muscatine County Jail, Detective Smithey then saw Martin in a room off the library, who just happened to be talking to his lawyer and just happened to have with him his notes and Marshall's notes about the Versypt murder. Notably, Martin had taken steps to document this information.

Whatever else he is, Martin is not a classic jailhouse entrepreneur. He had a proffer agreement and had at least two interviews under his belt prior to providing information about Marshall. Further, Detective Smithey's admission that he *may have* asked him if he had information about the Versypt murder, that Johnson in any event would *probably* advise him of the State's interest, Martin's timely transfer into Marshall's cellpod, and the remarkable coincidental meeting with Detective Smithey on October 3—where Martin presented Detective Smithey with documents—suggests more than luck or happenstance occurred here. In any event, as pointed out above, the federal cases are divided on the question of whether deliberate elicitation by informants at large gives rise to a *Massiah* violation. We think the better view, however, is that it does. *York,* 933 F.2d at 1357. As a result, for purposes of this case, we conclude that Martin should be considered an agent of the State for *Massiah* purposes.

**C. Deliberate Elicitation.** We next confront is the question of deliberate elicitation.

1. *Johnson.* The evidence shows that Johnson asked Marshall "what was he in there for" when they were both together in segregation in the Muscatine County Jail. The evidence also shows that Marshall

ultimately provided extensive information to Johnson about the underlying crime. As noted above, the disclosures made to Marshall are extensive—they go on, and on, and on. According to Johnson, the statements made to him by Marshall included the following comments: (1) there was no evidence or witnesses to the crime; (2) Marshall went to Burlington because police kept bothering him; (3) the police harassed him in Burlington and threatened him; (4) at first police said they had nothing on him and then they only had "a little gun powder;" (5) he was looking at a lot of time; (6) he, Calvin, and Weezy (Thompson's nickname) were playing dice in the hallway; (7) he arrived at the idea to rob the landlord; (8) Weezy then went into the apartment; (9) the robbery went wrong; (10) the landlord got shot; (11) the shot was loud; (12) he froze in the hallway and then ran out the back; and (13) he reentered through the front door. No direct evidence, however, was offered at the motion to suppress hearing or at trial about what Johnson specifically said to Marshall. Surely it is unlikely that Marshall engaged in an extended Shakespearean soliloquy about the crime. But the record does not provide an "I said, then he said, then I said" type of narrative.

On the one hand, this situation could be regarded as a failure of proof. It is, perhaps, conceivable that Johnson responded to Marshall's statements with neutral "Oh's" and "Uh's," other neutral filler comments, or solely with comments that did not encourage Marshall to elaborate. Recall that in *Matteo* a recorded telephone conversation revealed the informant had engaged in seventy-three one-word utterances in response to incriminating statements by a defendant. 171 F.3d at 896 n.3. Such an argument, however, did not persuade the district court in *Pannell*, 510 F. Supp. 2d at 192. In *Pannell*, the informant claimed he did not ask the defendant any questions about his case and that the defendant

volunteered his incriminating comments during lengthy conversations about everyday matters. *Id.* The district court found the informant's assertion incredible. *Id.* The district court noted that the informant "had great incentive to actively encourage [the defendant]" in light of his heavy sentence. *Id.* The district court concluded that there must have been some active encouragement from the informant and suppressed the statements. *Id.* at 193.

Yet on the record developed at trial, we think there has been a failure of proof. It is conceivable that Johnson only responded to volunteered incriminating statements made by Marshall with "Ah's" and "Oh's" or other comments that did not encourage Marshall to continue with the narrative. *See Matteo,* 171 F.3d at 896. Under *Kuhlmann* and related cases, such neutral or responsive comments are not considered deliberate elicitation. *See Kuhlmann,* 477 U.S. at 460–61, 106 S. Ct. at 2630–31, 91 L. Ed. 2d at 385. It is remarkable, perhaps, that Marshall's counsel—both at the motion to suppress and at trial—did not ask any questions of Johnson regarding his degree of participation in the communications with Marshall. It is possible that Marshall's counsel was not aware of the deliberate-elicitation requirement for finding a *Massiah* violation. It is also possible, perhaps, that Marshall did provide a lengthy, unprompted confession to Johnson, and said as much to his attorney. The record, however, is not adequate on this direct appeal to resolve any potential ineffectiveness claim based upon the failure of counsel to explore deliberate elicitation. A different record, of course, might be developed on remand.

2. *Martin.* As to Martin, there is no doubt that he deliberately elicited incriminating statements from Marshall. At the outset, Martin got "legal stuff" for Marshall about manslaughter and armed robbery.

According to Martin, "I told him, you know, you might have to tell your side of the story if you're going to get a lesser charge. So he went to write the story down . . . ." Martin's suggestion that it was in Marshall's interest to get out his side of the story is, of course, a classic police interrogation technique. *See, e.g., State v. Monroe*, 645 P.2d 363, 365 (Idaho 1982) (finding an interrogation when the police officer asked the defendant "if he would like to give his side of the story"); *State v. Hebert*, 82 P.3d 470, 481 (Kan. 2004) (inviting suspect to "tell his side of the story" constitutes an interrogation); *State v. Hannon*, 636 N.W.2d 796, 806 (Minn. 2001) (warning defendant that "his side of [the] story [would] never be known" after defendant invoked his right to counsel violated defendant's rights); *State v. Lynch*, 477 N.W.2d 743, 746 (Minn. Ct. App. 1991) (asking "[w]hat's your side of the story?" was an interrogation). Martin engaged in deliberate elicitation by any application of the *Kuhlman* standard. *See Calder v. State*, 133 So. 3d 1025, 1030–31 (Fla. Dist. Ct. App. 2014) (reminding accused that this was his opportunity to present his side of the story and that doing so would benefit him is "reasonably likely to elicit an incriminating response" (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297, 308 (1980))); *State v. Harris*, 741 N.W.2d 1, 7 (Iowa 2007) (characterizing statements to "get it out on the table" and "[t]ell us what really happened" as "reasonably likely to elicit an incriminating response" (quoting *Innis*, 446 U.S. at 301, 100 S. Ct. at 1689, 64 L. Ed. 2d at 308 (third quote))); *Hebert*, 82 P.3d at 483 (holding "[w]ould you like the opportunity to tell me your side of the story" elicited confession); *see also* Mark A. Godsey, *Shining the Bright Light on Police Interrogation in America*, 6 Ohio St. J. Crim. L. 711, 720–22 (2009).

Under the circumstances, Martin simply cannot be characterized as "a passive listener to a heartfelt confession." *Franciscus*, 710 A.2d at 1120 (majority opinion).

**D. Sua Sponte Harmless Error Under *Blaise*.** The State did not argue harmless error in its briefing in this case. Yet in *In re Detention of Blaise*, we held that we could consider the issue of harmless error when it was not raised in the briefing in a narrow category of cases. 830 N.W.2d 310, 319 (Iowa 2013). Factors to be considered include "(1) the length and complexity of the record, (2) whether the harmlessness of the error or errors found is certain or debatable, and (3) whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court." *Id.* (quoting *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991)). The main factor, however, is "the extent to which the harmlessness of the error is open to question." *Id.* at 320.

The first *Blaise* factor, length and complexity of the record, cuts against allowing a sua sponte harmless-error review. The trial lasted thirteen days with over a hundred exhibits. This was not a relatively short proceeding where the lack of harm is obvious from a cursory review of the record. Further, we note that the State originally charged someone else, Charles Thompson, with Versypt's murder. This original prosecution ended in a mistrial. This suggests that the question of who was responsible for the murder has been an open question and has shifted over time.

We now turn to the other *Blaise* factors, considering whether reversal will lead to futile proceedings and especially the extent to whether the harmlessness of error is open to question.

1. *Opening and closing statements as windows to sua sponte* Blaise *harmless error.* We look to the opening and closing statements of

the parties as a window into whether the demanding *Blaise* sua sponte harmless-error standard is met.

In its opening statement, the first substantive line from the prosecution was, "This is a case about a robbery that went wrong." The prosecution outlined in detail uncontested facts related to the murder. The prosecution continued by stating that the evidence would show that Marshall observed Versypt as he approached the apartments on the day of the murder. The prosecution noted that Charles Thompson, the previous defendant in the Versypt murder, would testify that Marshall took the clothes he was wearing on the day of the murder, placed them in a plastic bag, and threw them away. The prosecution also stated that the testimony of its experts would show gunshot residue on articles of Marshall's clothing.

The State closed by outlining the expected testimony of its three informants. The prosecution noted that these men were persons Marshall "thought that he could talk to and confide in." The prosecution summarized that Johnson would explain that Marshall told him that he, Charles Thompson, and another individual were playing dice and that Marshall and the other person decided to rob the landlord of rent money. The prosecution indicated that Martin was asked by Marshall "to help him write something that would make the shooting sound like an accident." The prosecution stated that Marshall asked Freeman for his help in stating that the shooting was an accident and asked Freeman to talk to his attorney about it.

In its opening statement, the defense began by noting that many of the facts were not in dispute. What was in dispute was "who did it." The prosecution noted that after a long and intensive investigation, the State charged Charles Thompson—and not Marshall—with the murder. With

respect to the three informants, the defense emphasized that they needed to provide incriminating information to get reduction of their sentences. The defense emphasized the lack of DNA and fingerprints linking Marshall to the crime. With respect to gunshot residue, the defense noted that gunshot residue was on the clothing of other occupants of the apartment where Marshall lived, including Charles Thompson. In closing, the defense declared, "Mr. Freeman, Mr. Johnson, Mr. Martin, those are witnesses that the State needs for their case." The defense again attacked their credibility and their incentive to provide incriminating statements.

In the prosecution's closing statement, it methodically summarized the testimony of trial witnesses. As in the opening statement, the prosecution developed in depth the details of the John Versypt's life, the investigation of the crime scene, and the autopsy. The prosecution described in detail the testimony of Martin, Freeman, and Johnson. The prosecution emphasized that Martin asked Marshall whether Marshall trusted him and that afterwards they developed a plan through which both would potentially benefit.

The prosecution read verbatim the entire contents of Exhibit 105, the statement drawn up by Marshall at the request of Martin. The prosecution emphasized to the jury, "[Y]ou'll be able to take a look and read it for yourself." The prosecution further summarized the testimony of Freeman and Johnson. All in all, the prosecution spent twelve consecutive pages of transcript discussing the testimony of the informants. The prosecution emphasized that the jury will "get to review [the written statement] where [Marshall] lays out and admits that he's the one who shot John Versypt." The State recognized that there was a lack of scientific evidence linking Marshall to the crime, noting the trial

was "not a TV show, not everything is wrapped up." But the prosecution emphasized that "Justin Marshall did tell others what happened, and they did testify."

In the defense's closing statement, the defense argued that the State "has almost no physical evidence against Justin Marshall," no eyewitnesses, DNA, or fingerprints. The defense noted that while gunshot residue, which has the capacity to migrate from one article of clothing to another, was found on Marshall's clothing, it was also found on the clothing of Thompson and Courtney White, who from time to time occupied the same apartment as Marshall. The defense noted testimony that the gun found at the crime scene belonged to Thompson, not to Marshall. The defense pointed at Thompson as a potential perpetrator, noting that in September 2011 at Thompson's trial the State identified him as the shooter.

After citing the shortcomings of the State's evidence, the defense declared, "[S]o what it comes down to, ladies and gentlemen, is what Justin Marshall said or supposedly said to the three convicted felons in the Muscatine County jail, Earl Freeman, Carl Johnson, and Antonio Martin." According to the defense, "[T]he State's whole case comes down to three long-time career criminals who have done this before in order to get a reduction in their sentences . . . ." In rebuttal, the prosecution focused immediately on the testimony of the three informants, noting that the prosecution had been "perfectly honest" about them. The prosecution then briefly recanvased aspects of the trial, including inconsistencies in Marshall's October 9 statement and testimony suggesting he disposed of his clothing after the murder. In closing, the prosecution again returned to the subject of the informants. The prosecution referred again to Exhibit 105, noting that "[t]his is not

something that was written by one of them.  This was something written by Justin Marshall."

2. *No sua sponte harmless error under* Blaise*.*  On the record before us, we decline to find sua sponte that the error in admitting Martin's testimony was harmless.  This was the second trial in connection with Versypt's murder, with the first trial against a different defendant ending in a mistrial.  The State then charged Marshall and a thirteen-day trial ensued.  The evidence admitted through Martin—especially incriminating written materials that virtually amounted to a confession—played a major role in the opening and closing statements of the parties.  The prosecution read the statement verbatim in closing argument and in rebuttal emphasized the written exhibit as proof of Marshall's guilt.  While Freeman offered testimony in some ways similar to Martin's, we do not think we can characterize Martin's contribution as merely cumulative in a *Blaise*-type review for sua sponte harmless error.

In addition, there was little direct scientific evidence linking Marshall to the crime, and Thompson was a good alternative suspect—indeed, some of the jurors in Thompson's trial were unwilling to acquit him of the charge.  Further, we note that the jury in this case asked a number of questions and ultimately were not unanimous on the theory of guilt.  We simply do not believe the narrow exception to our ordinary issue preservation rules found in *Blaise* has been met based on the record in this case.

**E.  Summary of *Massiah* Holdings.**  Based on our analysis of the record, we conclude that Johnson and Martin were agents of the State.  While Martin plainly deliberately elicited information from Marshall, we conclude that the evidence of deliberate elicitation is insufficient as to Johnson.  As a result, the motion to suppress should have been granted

as to Martin. Because the State does not argue harmless error and we cannot say with certainty that the error was harmless under *Blaise* standards, we vacate Marshall's conviction and remand the case for a new trial. We decide this case based on the Sixth Amendment of the United States Constitution, since this was the approach followed by the district court to decide the case. While we reserve the right to interpret and apply the right to counsel provision in article I, section 10 of the Iowa Constitution in a fashion different than under its federal counterpart, *see State v. Young*, 863 N.W.2d 249, 280 (Iowa 2015) ("Our tradition of the right to counsel is simply broader than that represented by [the federal counterpart]."), we do not consider any questions in this case related to the right to counsel under this state constitutional provision.

## VI. Conclusion.

For the above reasons, we hold that the district court improperly overruled the motion to suppress as to Martin. As a result, the decision of the court of appeals must be vacated and the judgment of the district court must be reversed and the case remanded to the district court for further proceedings.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

This case can be resolved by common sense, precedent, and basic constitutional principles. A defendant who volunteers incriminating statements to a fellow inmate is not deprived of his Sixth Amendment right to counsel just because the fellow inmate has a cooperation clause in his plea agreement and is cooperating with law enforcement. Jail is not a pure, pristine environment. Its occupants therefore run the risk that persons with whom they are sharing confidences may be, in common parlance, "snitches." The State does not violate the Sixth Amendment by taking advantage of this situation so long as the State does not circumvent the right to counsel by using jailhouse stand-ins to question inmates. The Iowa City Police Department did not do that here or anything close to that. I therefore respectfully dissent in part.

In my view, the court goes well off the tracks in holding that Antonio Martin's testimony should have been suppressed. It appears the Iowa City police had not spoken to Martin at all about the Versypt killing before the defendant and Martin discussed it in jail; at most Martin had been asked one general question about it. Furthermore, Martin disclosed to the defendant from the beginning that he was a snitch, and the defendant *intentionally sought to use Martin as a snitch* to tell his version of Versypt's death. As a practical matter, the majority finds a constitutional violation only because Martin gave the defendant advice that the defendant's own counsel would not have given. Unlike the court, I would not recognize this new constitutional claim of "ineffective assistance of fellow inmate."

The majority opinion, I fear, threatens to harm legitimate law enforcement in Iowa. Under the majority's approach, anyone who enters

into a cooperation agreement with the federal government as part of his or her guilty plea—a fairly common occurrence—becomes a roving agent "at large" of the State of Iowa. If this person then interacts with another inmate, even if the interaction merely results in the inmate writing out what the inmate has already said, a violation of the Sixth Amendment right to counsel has occurred. I am unaware of any court anywhere in the country that has adopted such an expansive view of *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).[2]

I believe the court's conclusions are driven by a fundamentally wrong-headed view of the right to counsel. Undoubtedly, the government has a constitutional obligation not to circumvent defendant's legal counsel. And that does happen in some cases, although it clearly didn't happen here. However, the majority's position is that the State has to make the jail a sanitized environment where every inmate can trust that any fellow inmate who engages him in conversation isn't cooperating with the government. If the guarantee is violated, any statements can't be used even if (as in the case of Martin) the defendant *knew* the fellow inmate was cooperating with the government.

A further flaw in the court's approach is that it is utterly unrealistic. Offenders have snitched on one another ever since Adam blamed Eve for giving him the forbidden fruit. This will continue to occur because the nature of plea bargaining and sentencing (especially federal sentencing) provides a strong incentive for it to occur. The court's opinion, however, provides a strong disincentive for the documentation of

---

[2]I discuss below the cases that the court claims support its approach. There is a Massachusetts case that adopts the majority's view of agency but requires more by way of deliberate elicitation than the majority does today. *See Commonwealth v. Murphy*, 862 N.E.2d 30, 43–45 (Mass. 2007).

such arrangements. Instead of formal cooperation agreements, which provide a clear basis for impeaching the informant while also providing a sanction if the informant doesn't tell the truth, there will be vague and muddy informal arrangements.

## I. Additional Factual Background.

A fair understanding of this case needs to begin with more facts than the majority provides. The majority's quick "overview of the crime" does not adequately convey the strong evidence of Justin Marshall's guilt.[3] This evidence helps explain why Marshall was not so much a victim of jailhouse snitching as a willing participant, when he sought out others to tell his story in the hope that he would be convicted of a lesser charge than first-degree murder.

Several witnesses placed Marshall in the location where Versypt was killed at the time he was killed. Marshall was also tied to the murder weapon. In addition, gunshot residue was found on Marshall's jacket. Marshall's statements to police were highly inconsistent and revealed details about Versypt's death not known to the public. Marshall later told two fellow inmates—the admissibility of whose testimony is *not* questioned by the majority—that he had planned to rob Versypt, that Versypt went for the gun or otherwise startled him, that as a result Marshall shot Versypt, and that Marshall then wiped the gun off on his own jacket and ran.

John Versypt's death from a gunshot wound occurred around 4 p.m. on October 8, 2009. Officers found his body lying on the floor on

---

[3]The district court found there was substantial evidence to support guilty verdicts on all of the theories presented to the jury, including that Marshall committed murder as a principal, that Marshall engaged in joint criminal conduct (i.e., he intentionally joined a robbery during the course of which Versypt was murdered), and that Marshall committed felony murder (the felony being robbery). I agree.

the back landing of Building C of the Broadway Condominiums. Versypt had been shot once, with the bullet passing at close range through one of his hands and his face. Versypt passed away before the officers arrived. The officers retrieved a multicolored .38 caliber revolver that had been left near Versypt's body.

Shawnta Jackson lived in a third-floor apartment of Building C. While doing laundry downstairs that afternoon, she had noticed Marshall and another person (Courtney White) standing outside the back door of the building. Later, when Jackson returned to get her laundry, she saw Versypt lying on the ground on the back landing. He was bleeding and gasping for air. Jackson ran back up to her apartment.

Andrew Shepard resided in the same third-floor apartment of Building C as his sister Jackson. After Jackson ran into the apartment telling Shepard in shock what she had seen, Shepard hurried downstairs. Versypt was still breathing heavily, and Shepard saw a gun on the ground. Shepard called the police. While Shepard was on the phone with the 911 operator, Versypt stopped breathing. Shepard also saw a drill, a wallet, and signs on the floor. The wallet was open.

The next day, Shepard discussed with his brother what he had seen. Marshall joined the pair and asked what kind of gun Shepard had observed near the body. Shepard said it was a camouflage .38. Marshall admitted to owning "a gun just like that one." Oddly, though, Marshall claimed to have been in Shepard's apartment at the time of the shooting. Shepard disputed that, telling Marshall he had not been in Shepard's apartment. Marshall insisted he had been in Shepard's apartment, and Shepard again disagreed.

James Brown lived in Building C in an apartment next door to the apartment where Marshall and Charles Thompson resided. On the night

before the shooting, Brown was visiting the other apartment and noticed a dark-colored gun that appeared to be a .38 lying on the bed in the back bedroom. At that time Marshall and Thompson were present in the bedroom. Brown later saw the actual gun that was retrieved from beside Versypt's body. He identified this as the same gun he had seen the night before the shooting.

Brown's account of the shooting generally aligned with Shepard's. Brown heard a shot go off and heard the back door of the building "bust open real quick" but was unable to see anyone exit the building. A few minutes later, Brown could hear Marshall knocking on the door of his own apartment, quietly asking his own aunt (who also resided in the apartment) to let him in. When Brown opened the door and looked downstairs, he saw Versypt's body lying on the landing. Versypt was in the process of dying, and Shepard was on the phone with the 911 operator.

On the evening of the shooting, a surveillance camera caught Marshall and Thompson carrying garbage bags out of Building C, which they tossed into the dumpster. However, a jacket that Marshall had been seen wearing during the afternoon of the shooting was later recovered by police. It tested positive for gunshot residue.

Marshall was interviewed by police and made numerous inconsistent statements. His recorded interviews were subsequently played back for the jury. Initially Marshall denied knowing anything about the shooting. Later he tried to implicate Thompson, claiming he heard Thompson talking on the phone about "hitting a sweet lick [robbery]" around 2:30 p.m. on the day of the fatal shooting. Police were unable to corroborate from phone records that this call had actually occurred.

Later still Marshall said that Thompson and someone else had planned to rob Versypt. He claimed he overheard Thompson saying on the telephone afterward that "we hit a lick," but the lick "went wrong." Yet further into the interview, Marshall contradicted himself again and said that these alleged statements were made during a personal conversation he had with Thompson the night after the shooting.

Marshall also told police that Versypt had been shot in the face. When asked how he knew this, Marshall became flustered and claimed the police had told him. In fact, the police had deliberately withheld this factual detail.

Thompson was originally charged with Versypt's murder. However, his trial ended in a mistrial when inadmissible evidence was inadvertently introduced. Subsequently, he reached a deal with the State wherein he pled guilty to being an accessory after the fact.

Thompson ultimately testified against Marshall at Marshall's trial. According to Thompson's testimony, right after the shooting, Marshall came into their apartment and said that someone had been shot in the hallway. Later in the evening, Thompson saw Marshall putting the pants he had been wearing that day in a plastic sack. Marshall then placed the sack in a larger garbage bag from the kitchen. This was one of the bags the two men threw out that evening.

## II.  The Informants.

On July 12, 2011, a criminal complaint was sworn out against Marshall. Marshall was arrested in Texas several days later and transported back to Iowa. On August 1, a trial information was filed charging Marshall with first-degree murder. Marshall pled not guilty on August 2. He was thereafter held in custody at the Muscatine County Jail.

Over the course of the Versypt murder investigation, Detective Michael Smithey interviewed several jailed individuals he thought might have information about the killing. Detective Smithey stated that the focus of such interviews was "[t]o gather information that they have from while they were on the street or that they have gathered while incarcerated." Detective Smithey said that individuals who have been arrested for "federal-level drug crimes" can be particularly helpful in investigations because they are well known in their communities and can often "shed light on violent crimes, robberies, serious assaults, homicides, [and] other [crimes]." He continued, "People in those situations are a wealth of knowledge about what is going on in the street and who is doing what." Detective Smithey denied giving any instructions to the persons he interviewed:

> [P]eople oftentimes ask, do you want us to find it? No, we're not telling you to do anything. If you learn something, contact us, but there are no specific directions as to find something out about this person or ask them this or anything like that.

Three of these informants ended up testifying against Marshall— Carl Johnson, Earl Freeman, and Antonio Martin. The majority concludes that error occurred only with respect to the admission of Martin's testimony. Let me therefore review the testimony of the other two informants before I get to Martin.

**A. Johnson.** Johnson was being held in the Muscatine County Jail during the summer of 2011 following a federal conviction for conspiracy to distribute cocaine. He had entered into a guilty plea that included a cooperation agreement. Johnson had originally been sentenced to 240 months in prison, but after he testified against his codefendant, his sentence was reduced to 140 months.

On July 12, Johnson went through a proffer interview with Detective Smithey and Detective Jennifer Clarahan in the presence of Johnson's attorney. Detective Smithey subsequently testified regarding the interview as follows:

> Q. Now, according to your report, the first thing you told him was we're here for information about the death of John Versypt or words to that effect, correct? A. May I refer to my report?
>
> Q. Yes. I'm looking at paragraph 2. A. Yes.
>
> Q. Then, on the next page, he was asked to provide information about Charles Thompson, also known as Weezy. Do you see that there? A. Yes.
>
> Q. Paragraph 4, he was asked to provide information about Justin Marshall. Do you see that? A. Yes.
>
> Q. And then paragraph 5, he was asked to provide information about Courtney White, also known as Mow-Mow. Do you see that? A. Yes.
>
> Q. So, Officer, first you go into Mr. Johnson and you say, we're here to talk about the killing of John Versypt. Then you give him the names of people you're interested in, whether it's [Charles Thompson], Justin Marshall, or Courtney White. Do you recall doing that? A. Yes. It's in the report.

Johnson said he had been a resident of the Broadway Condominiums at the time of the shooting, and he remembered discussing it with other residents when it occurred. During the interview, Johnson told Detective Smithey that Marshall had said Thompson killed Versypt. Detective Smithey did not ask Johnson to gather any more information from Marshall, Thompson, or White but did tell Johnson to "contact me if he learned anything further."

In September, Johnson's attorney contacted Detective Smithey, indicating that Johnson might have additional information about the Versypt killing. Detective Smithey accordingly reinterviewed Johnson at

the jail.  Johnson said he had learned more from Marshall after both men had been placed in a segregated area of the jail in August for separate rule violations.  According to Johnson's trial testimony, their discussion went as follows:

> Q.  What did you discuss initially with Justin Marshall when you first started talking to him while you were in segregation?  A.  Well, when I first—I say to him then, I knew him so I asked him what was he in there for.
>
> Q.  And what did he tell you?  A.  He say, man, they got me for that landlord, and he cursed.
>
> Q.  Did he tell you more about what happened that led him to be charged or did he tell you more about the landlord being shot?  A.  Both.

In further conversation, Marshall disclosed to Johnson that he (Marshall) came up with the idea to rob Versypt because "some [tenants] pay with cash."  Marshall also told Johnson that "the robbery went wrong" in that "[t]he landlord got shot."  According to Johnson, Marshall described the shooting in the following terms:

> All [Marshall] said was it was real—the shot was loud.  It was loud in the hallway, and that kind of like froze him up, and after that he ran out the back to get away from the scene. He came back around, knocking on the front door, but he was whispering a little bit because he didn't want nobody to know he was in the hallway.

The Iowa City police had made no effort to have either Johnson or Marshall placed in segregation.  Detective Smithey also denied asking Johnson to try to obtain more information or indeed any information from Marshall regarding the killing of Versypt.  Detective Clarahan likewise testified that she never asked Johnson to obtain information from Marshall, nor did she ever hear anyone else from the State ask Johnson to get information from Marshall.

**B. Freeman.** Freeman was also housed in the same cell block at the Muscatine County Jail as Marshall for a time period in 2011. At one point, while Freeman was helping Marshall draft a motion for appointment of new counsel, Marshall spoke with Freeman about the reasons why he (Marshall) was in jail. Marshall provided Freeman with this version of what had happened on October 8, 2009:

> [Marshall] went to rob him. [Versypt] grabbed for the gun. The gun went off, shot him in the hand, shot him in the head. He fell in the door or . . . on the ground in the doorway . . . and [Marshall] wiped the gun off the front of his jacket and he took off.

Marshall told Freeman that no one else was involved in the attempted robbery and fatal shooting and that Thompson was "innocent."

Marshall also explained that he wanted to get his charges reduced from murder to manslaughter. He thus discussed a scheme with Freeman under which Freeman would tell his attorney that Marshall had confessed to an accidental shooting. Marshall wrote out on a yellow pad what he wanted Freeman and another inmate—Martin—to say.

**C. Martin.** This brings us to Martin. In November 2010, Martin was arrested on federal charges for conspiracy to distribute cocaine and a firearms violation. He pled guilty, and his plea agreement included a cooperation agreement with the federal government in which he agreed to be interviewed by law enforcement and provide truthful information. Martin understood that if he provided substantial assistance in another criminal case to the government and the United States Attorney's Office filed a motion, the federal district court could reduce his sentence. In fact, when Martin was sentenced on his federal charges in March 2012, Martin received a large reduction in his sentence after testifying against his cousin, a codefendant in his case.

Although Martin had a cooperation agreement, his discussions with the Iowa City police before October 2011 related to other matters and not the Versypt killing. On cross-examination, Detective Smithey conceded he "may have asked [Martin] if he had any knowledge of it . . . but it would have been just a simple, do you know any information about this?" At this point, Martin's answer obviously would have been no.[4]

Between his arrest in November 2010 and his sentencing in March 2012, Martin was also being held at the Muscatine County Jail. Martin previously knew Marshall from the Broadway neighborhood, yet had not seen him since 2009. In August 2011, Martin ran into Marshall when he was moved into Marshall's sixteen-man pod. There is no evidence that the State deliberately placed the men together or that Martin sought out Marshall's pod.

In their initial conversations, Marshall told Martin that he was in jail for the murder of Versypt but denied having anything to do with it. Martin in turn told Marshall what his federal charges were and that he was testifying against one of his codefendants. In other words, Marshall *knew* that Martin was a "snitch." In fact, Marshall intended to use Martin for that purpose.

As time passed, Marshall stopped claiming that he had nothing to do with Versypt's death. Instead, Marshall related to Martin a different story—that Versypt had startled Marshall, Marshall's gun had accidentally gone off, and then Marshall had wiped the gun off and run away. As Martin testified,

---

[4]Martin himself did not recall ever meeting Detective Smithey prior to October 2011. Regardless, Detective Smithey's testimony that he "may have" asked Martin in passing about the Versypt killing does not demonstrate that Detective Smithey asked Martin to gather information on that killing, let alone that Detective Smithey asked Martin to get information on Marshall.

Q. [D]id he tell you what happened when he went out to sell the gun? A. He said he went downstairs and somebody came up behind him saying something, coming, approaching him, and he got scared and he turned around and pulled the gun from his waistband.

Q. Did he tell you what he did with the gun? A. He said it all happened so quick, you know. The gun went off and he dropped it and picked it back up and wiped it off and dropped it again and ran.

Marshall also told Martin he was trying to get his charge reduced to manslaughter and asked Martin for information on the legal definition of manslaughter as well as armed robbery. At this point, Martin encouraged Marshall to *write* his story down, i.e., to "use [Martin] as a jailhouse snitch" so Martin could "get [Marshall's] story out and it might help both of [them]." Marshall did his writing on a legal pad provided by Marshall's attorney. Martin was not present when Marshall wrote out his account and never told Marshall what to write.

In October 2011, Martin was telephoning with his own attorney at the Muscatine County Jail and took Marshall's handwritten story with him. It turned out that Detective Smithey was there that day as well on another matter. Neither Martin nor Detective Smithey knew the other was going to be present. When Detective Smithey came into the room, Martin showed him the legal pad and let him scan it but didn't let him keep it. Detective Smithey then obtained a search warrant for Marshall's cell. Marshall's handwritten story, by then torn into pieces that had to be reassembled, was recovered from Marshall's jail cell. It was identified by both Freeman and Martin and used against Marshall at trial.

The majority says it is a "remarkable coinciden[ce]" that Detective Smithey was at the jail the day that Martin was talking on the phone with his attorney. I do not find this remarkable. In 2011, Detective Smithey had been reassigned to the Johnson County Drug Task Force

and thus had numerous other reasons to be at the jail. Here is Detective Smithey's testimony that the majority finds unbelievable and that I do not:

> Q. How did it come about that you interviewed him that day? A. I had just finished having a conversation with someone else there at the jail. There are two areas where these conversations typically take place. One is the library. It's a fairly sizable room with law books, and I don't know if it's technically a law library there or not, but there's fairly— it's where most of the meetings take place because there are multiple tables in it where five, six, ten people could probably sit. And then there's another room that is between the library and the door that is used to exit the secure area of the facility. As I was leaving the library area, I saw Antonio Martin sitting alone inside that other much smaller room. It's a room that four people would be uncomfortable being in. It's tight. He was alone in that room. And I confirmed with jail staff that it was indeed Mr. Martin in the room.

> Q. And what did you do when you saw Mr. Martin? A. I asked the jail staff if they'd allow[] me in to speak with him, and they did. I went into the room, and he was on the phone with his attorney at the time. I identified myself to her. I knew her from other cases that I was working, and they allowed me to sit in and ask a few questions of Mr. Martin.

> Q. While you were sitting in with Mr. Martin, did Mr. Martin show you anything? A. He did.

> Q. And could you just generally describe what he showed you. A. Mr. Martin showed me a yellow legal pad. That legal pad had—it wasn't completely full. It had four pages. The first four pages had writing on them. The others were blank.

The district court found that Martin "collected information prior to and without being approached by the police." Unlike the majority, I would not disbelieve Detective Smithey but would rely on the trial judge's evaluation of what happened here.

**D. The District Court's Ruling.** The district court overruled Marshall's motion to suppress the testimony of Freeman, Martin, and Johnson on the following grounds:

> I have had a chance to review the standard, and I'm going to overrule the motion to suppress and allow the witnesses to testify. The case law suggests that an informant becomes a government agent for purposes of the test only when the informant has been instructed by the police to get information about a particular defendant. The defendant must demonstrate that the police and their informant took some action beyond merely listening that was designed deliberately to elicit incriminating remarks.
>
> . . . .
>
> . . . The primary—the cases indicate that the primary concern of those decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. The Sixth Amendment is not violated, however, whenever, by luck or happenstance, the State obtains incriminating statements. I think this case presents just the sort of luck or happenstance that resulted in these gentlemen coming forward and providing information to the State based upon what they alleged to have been statements made by Mr. Marshall.

I think this analysis succinctly summarizes why there was no Sixth Amendment violation here.

**III. Marshall's Sixth Amendment Right to Counsel Was Not Violated Because Martin Was Not a Government Agent When He Spoke to Marshall.**

In *Massiah*, the United States Supreme Court held that a defendant

> was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

377 U.S. at 206, 84 S. Ct. at 1203, 12 L. Ed. 2d at 250. Thus, a *Massiah* violation requires findings that the informant was a government "agent" and "had deliberately elicited" statements from the defendant. *Id.* Both

of those elements are simply absent here. I will start with agency. Marshall bears the burden of proof in establishing agency. *See Moore v. United States*, 178 F.3d 994, 997, 999 (8th Cir. 1999); *Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir. 1987).

I agree with the essence of the State's position: Without some direction or instruction from the government, an informant does not become a government agent for *Massiah* purposes. The most one can say here is that Martin had entered into a plea agreement on federal charges wherein he agreed to cooperate with the government in the hope of receiving a sentence reduction and that Martin and Marshall ended up in the same jail pod. These routine circumstances fall well short of establishing agency.

It is important to note what this case does *not* involve. There is no evidence that Martin was asked to contact Marshall or engage him in conversation. There is no evidence that any person with knowledge of Martin's status placed him in the same unit with Marshall (or even knew they were going to be together). There is also no evidence that Martin sought out Marshall.

Since *Massiah*, three other Supreme Court decisions have specifically addressed the government use of informants to allegedly circumvent the Sixth Amendment right to counsel. *See Kuhlmann v. Wilson*, 477 U.S. 436, 456, 106 S. Ct. 2616, 2628, 91 L. Ed. 2d 364, 382–83 (1986); *Maine v. Moulton*, 474 U.S. 159, 171, 106 S. Ct. 477, 484, 88 L. Ed. 2d 481, 492–93 (1985); *United States v. Henry*, 447 U.S. 264, 269, 100 S. Ct. 2183, 2186, 65 L. Ed. 2d 115, 121 (1980).

No one disputes that *Henry* is the high-water mark for the Supreme Court's recognition of claims of *Massiah* violations. In *Henry*, FBI agents reached out to Nichols, a paid informant, who was being held

in the same jail as Henry. *Henry*, 447 U.S. at 266, 100 S. Ct. at 2184, 65 L. Ed. 2d at 119. Henry had been indicted for armed robbery, and the facts were not clear whether the government contacted Nichols for information about the robbery more generally or asked for information specifically about Henry. *Id.* Nichols told the agents that he was on the same cellblock as several federal prisoners including Henry, and "[t]he agent told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." *Id.* at 266, 100 S. Ct. at 2184–85, 65 L. Ed. 2d at 119. After Nichols' release from jail, the same FBI agent contacted him, and Nichols gave the agent information that Henry had revealed to Nichols in conversation. *Id.* at 266, 100 S. Ct. at 2185, 65 L. Ed. 2d at 119. The government paid Nichols for the information. *Id.* Nichols testified at Henry's trial, and Henry was convicted. *Id.* at 267, 100 S. Ct. at 2185, 65 L. Ed. 2d at 120.

> Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion. The arrangement between Nichols and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information.

*Id.* at 270, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122.

In its opinion, the Court concluded, "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Id.* at 274, 100 S. Ct. at 2189, 65 L. Ed. 2d at 125. The Court added, "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such

propinquity likely would lead to that result." *Id.* at 271, 100 S. Ct. at 2187, 65 L. Ed. 2d at 122. Otherwise stated, the Court found that Nichols was "acting by prearrangement as a Government agent." *Id.* at 273, 100 S. Ct. at 2188, 65 L. Ed. 2d at 124.

We applied *Henry* not long after it was decided in *State v. Nelson*, 325 N.W.2d 118, 120 (Iowa 1982). In that case, Jackson, an informant, passed a note to a jailer stating that he had information regarding Nelson's case that he wanted to discuss with law enforcement. *Id.* at 119. The informant met with a deputy sheriff and passed along incriminating statements made by Nelson in jail. *Id.* The deputy sheriff told the informant that he would put him in touch with the officers investigating Nelson's case. *Id.* The deputy "made no promise to Jackson in return for the information," and "he did not direct Jackson to endeavor to gather any further information." *Id.* Rather, "[h]e merely had Jackson return to his cell to continue in the same capacity as an inmate." *Id.* The deputy "obviously knew further conversations were likely." *Id.* Still we reasoned that "[t]he crux is that the State had not 'put him [the informant] up to it.' " *Id.* After this first meeting, Jackson later met with law enforcement again and agreed to work for the state on other cases. *Id.*

We affirmed the trial court's ruling that only statements made by Nelson after Jackson's second meeting with law enforcement should be suppressed whereas statements made after the first meeting were admissible. *Id.* at 120. With respect to the first meeting, we noted both that the state had not directed Jackson to gather more information and that Jackson had no agreement with the state that he would receive payment or other favorable treatment for providing the information. *Id.* at 119–20. "In summary we do not believe the statements which were

the subject of Jackson's testimony were gathered by him at the time he was working for the State." *Id.*

This case falls short of the circumstances warranting suppression that were described in either *Henry* or *Nelson.* At most, prior to Martin's encounter with Marshall, Detective Smithey might have asked Martin a simple question as to whether Martin had any information about the Versypt killing. Again, there is no evidence the Iowa City Police Department knew Martin was going to be housed with Marshall, made arrangements for this to happen, told Martin to listen for statements by Marshall, or even expressed particular interest in the Versypt killing.[5]

The majority places great weight, apparently dispositive weight, upon Martin's federal cooperation agreement. Although Martin's plea bargain is not in the record, there is no indication that it included anything other than a typical, plain vanilla federal cooperation agreement. Under such an agreement, the defendant agrees to meet with the government and provide truthful information about criminal activity of which he or she is aware, and the government agrees to move for a downward sentencing departure if the defendant ends up providing substantial assistance to the government. *See, e.g.*, *United States v. Cimino,* 381 F.3d 124, 125 n.1 (2d Cir. 2004); *United States v. Tejada,* 773 F. Supp. 622, 624 (S.D.N.Y. 1991).

---

[5]The majority points to testimony given by Detective Smithey on cross-examination that it would "[p]robably" be "reasonable to assume" that after the July 2011 meeting, Johnson was "going to tell other snitches" that the government wants to know about the Versypt killing and the people the government was interested in. However, Martin denied discussing Marshall with Johnson, and Johnson likewise denied discussing Marshall with Martin. Moreover, the three individuals who were persons of interest in the Versypt killing—Marshall, Thompson, and White—were already widely known to the general public.

So, the question becomes, in effect, if an individual enters into a standard cooperation agreement, does that individual become a government agent with respect to any matters in which the government happens to have interest?

A number of federal circuits would say no under their bright-line approach. They hold that a cooperation agreement is not enough unless the informant is "instructed by the police to get information about the particular defendant." *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir. 2010) (quoting *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997); *see United States v. LaBare*, 191 F.3d 60, 65–66 (1st Cir. 1999); *Moore*, 178 F.3d at 999. Clearly that did not occur here.

The majority is correct that many circuits do not follow the bright-line approach. But when one reviews the facts and holdings of these cases, none of them is helpful to Marshall.

Thus, the Third Circuit has found that a combination of an informant's "tacit agreement with the government" to receive potentially favorable sentencing treatment and the government's deliberate placing of the informant in a cell with another inmate to obtain information from the inmate could amount to a *Massiah* violation. *United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994). The Fourth Circuit requires that "the prosecutors have intentionally placed the informant in the jail cell with instructions to elicit a confession, or . . . there has been an agreement promising consideration for a confession from a particular defendant." *United States v. McFadden*, 187 F. App'x 290, 294 (4th Cir. 2006). The Fifth Circuit has approved a test for agency under which the informant must have "acted pursuant to instructions from the State, or otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998). Similarly, the Seventh Circuit has refused to find a

*Massiah* violation when "[t]he evidence demonstrated no government control over [the informant's] actions; most importantly, there was no control over [the informant's] decision to arrange a meeting with [the defendant]." *United States v. Li*, 55 F.3d 325, 328 (7th Cir. 1995). The Ninth Circuit has held that a *Massiah* violation can occur when the informant is intentionally "put back in the cell with [the defendant]" after meeting with law enforcement and indicating a "willingness to cooperate with the prosecution" even without a promise of leniency. *Randolph v. California*, 380 F.3d 1133, 1146–47 (9th Cir. 2004). Meanwhile, the D.C. Circuit rejected a Sixth Amendment claim when the informant "was acting as an entrepreneur" and the government had not encouraged or instructed him to speak with the defendant in jail. *United States v. Watson*, 894 F.2d 1345, 1348 (D.C. Cir. 1990).

As can be seen, the nonbright-line circuits are not uniform in their approaches. However, under *any* of these standards Marshall has failed to establish that Martin was acting as a government agent. Martin had received no instructions from the State, and his encounters with Marshall in the same segregation unit of the jail were pure happenstance.

The majority attempts to use *United States v. York*, to support its "informant at large" theory. *See York*, 933 F.2d 1343 (7th Cir. 1991), *overruled on other grounds by Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999). The case is easily distinguishable. In that case, the informant had a longstanding relationship with the FBI and was reporting to the FBI on a weekly basis and making monitored phone calls on the FBI's behalf. *Id.* at 1357–58. After giving the information to the FBI that was used against the defendant, he received $5000 from the FBI. *Id.* at 1358. Additionally, the FBI agent "told [the informant] the

type of information he was interested in receiving; that statement was tantamount to an invitation to [the informant] to go out and look for that type of information." *Id.* In dicta, the Seventh Circuit concluded that an agency relationship existed between the FBI and the informant, although it ultimately found there had been no deliberate elicitation and therefore no *Massiah* violation. *Id.* at 1358–60.

The Seventh Circuit's test for agency was based on traditional common law agency principles, and under the egregious facts of *York* the Seventh Circuit said that the informant served as an agent subject to the government's control. *See id.* at 1357–58. However, it is noteworthy that the court today *disclaims* a common law agency test. It is also noteworthy that more recently, the Seventh Circuit declined to find agency when the informant discussed with the government his plan to meet with the defendant, but there was no government control over the informant's actions or his decision to arrange a meeting with the defendant. *See Li*, 55 F.3d at 328.

Another informant-at-large case, *Commonwealth v. Moose*, is also factually distinguishable from what occurred here. *See* 602 A.2d 1265 (Pa. 1992). In that case, the informant had been intentionally "kept in the county jail for three years because he was supplying the district attorney's office with information about various inmates." *Id.* at 1270. In fact, this informant "was called the 'monsignor' because so many inmates allegedly confessed to him." *Id.* The Pennsylvania Supreme Court concluded that even though the informant "was not planted for the purpose of gaining information from a targeted defendant," "[t]he fact that the Commonwealth intentionally left him there to harvest information from anyone charged with a crime and awaiting trial is the

villainy." *Id.* Again, these extreme facts that supported a finding of agency bear no resemblance the record here.

The majority also cites *Ayers v. Hudson*, 623 F.3d 301, 312 (6th Cir. 2010), to support its view that "a wink and a nod" can establish agency. The Sixth Circuit disavows the bright-line approach. *Id.* at 311. ("We agree with those courts that do not limit agency in the *Massiah* context to cases where the State gave the informant instructions to obtain evidence from a defendant."). Yet once again, the facts of the case cited by the majority are quite different from here. In *Ayers*, the defendant confessed to an informant sharing his jail pod that he had committed a murder. *Id.* at 305. The informant contacted the police and met with detectives to relay this information. *Id.* At that time, the informant could not provide the detectives with information about the murder weapon or money stolen from the victim. *Id.* The detectives' report specifically noted this information was missing. *Id.* The detectives returned the informant to the jail pod and "within an hour or so" thereafter, the informant directly questioned the defendant regarding the murder weapon and the stolen money. *Id.* at 305–06. The Sixth Circuit suppressed the statements regarding the weapon and the money that the informant had obtained from the defendant within an hour after meeting with the detectives. *Id.* at 310.

By contrast, in the present case, the State did not intentionally place Martin in proximity to Marshall so he could procure additional information. Moreover, the record in *Ayers* strongly suggested the informant had been given specific guidance by the police, considering that he immediately sought out the two pieces of information the detectives wanted. *See id.* at 305. No such guidance was given to Martin.

The only appellate decision I am aware of that might help Marshall establish agency under the facts of this case comes from the Massachusetts Supreme Judicial Court. *See Commonwealth v. Murphy*, 862 N.E.2d 30 (Mass. 2007). Murphy was found guilty of murder following a trial at which an informant testified to statements Murphy made in jail. *Id.* at 34–35. The informant had entered into a plea agreement with the United States Attorney's Office and subsequently met Murphy in jail. *Id.* at 34. Under the terms of the plea agreement, "if the informant provided 'substantial assistance' to the government, in the discretion of the United States Attorney's office," the informant could potentially receive a lesser sentence. *Id.* at 36. The informant did not have any agreement with any Massachusetts authorities. *Id.* at 35. The informant did two favors for Murphy to lure him into a false sense of trust, before asking Murphy what he did about his anger toward the victim. *Id.* at 44–45. The court concluded that the informant had acted as a government agent and found a violation of both the Sixth Amendment and its counterpart in the Massachusetts Constitution. *Id.* at 46. The court explained,

> [W]here the government has entered into an "articulated agreement containing a specific benefit," or promise thereof, the recipient inmate is a government agent for purposes of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights even if the inmate is not directed to target a specific individual.

*Id.* at 33 (quoting *Commonwealth v. Reynolds*, 708 N.E.2d 658, 664 (Mass. 1999)).

I do not agree with this decision, which essentially holds that a generic cooperation agreement is enough to confer government agent status on an individual. *See Whitten*, 610 F.3d at 193 ("More than a cooperation agreement is required to make an informant a government

agent with regard to a particular defendant."). Generally, of course, the mere existence of an agreement containing a quid pro quo does not make one party the agent of the other. Contract law teaches us that all enforceable agreements have a quid pro quo, but that does not mean the parties become agents of each other. *See* Restatement (Third) of Agency § 1.01 cmt. *c*, at 19 (Am. Law Inst. 2006) ("Not all relationships in which one person provides services to another satisfy the definition of agency."). There must be some element of control, based on an actual instruction to target a specific defendant, as several circuits hold, or some other form of supervision, such as intentionally placing the informant directly with the defendant in order to obtain information from the defendant. Even foreseeability that the informant would engage with the defendant, which we do not have here, was not enough according to our *Nelson* decision. *See Nelson*, 325 N.W.2d at 119–20 (finding the informant was not "working for the State" because the State "had not 'put him up to it' " even though the State "obviously knew further conversations were likely"). Here there is simply no indication that Detective Smithey directed or controlled Martin's activities.

My colleagues do not approve of a direction-or-control requirement. But the law as established by the United States Supreme Court requires that the informant be a government "agent." *See Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203, 12 L. Ed. 2d at 250. And to be an agent one must agree to act on a principal's behalf and be subject to the principal's control. *See* Restatement (Third) of Agency § 1.01, at 17. So, a control element focuses the inquiry where it should be focused.

By resorting to circular reasoning, the court leaves a hole in its analysis. The majority states, "[A] court must determine—under all the facts and circumstances—whether the relationship between the state and

an informant is such that the state has violated its affirmative duty . . . to protect the Sixth Amendment rights of defendants." This circular standard is no standard at all. Rather, it simply restates the ultimate issue—i.e., whether the Sixth Amendment has been violated.

Given this circularity, we need to consider what *as a practical matter* the court relies on to find agency here. As in *Murphy*, it is merely the existence of a generic cooperation agreement between Martin and the federal government.

Given the nature of federal sentencing, federal defendants are often motivated to inform on other inmates with or without a cooperation agreement. *See* 18 U.S.C. § 3553(e) (2012) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense").

"Entrepreneurs and volunteers are not government agents." *United States v. Johnson*, 338 F.3d 918, 924 (8th Cir. 2003). Marshall fell prey to the self-interest of other inmates, not government interference with his right to counsel. This is clearly not a case where the government acted "to circumvent the right to the assistance of counsel." *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487, 88 L. Ed. 2d at 496. Because Martin was not acting as a government agent, Marshall's Sixth Amendment rights were not violated.

**IV. Martin Did Not Deliberately Elicit Statements from Marshall.**

Marshall's *Massiah* claim also fails because Martin did not deliberately elicit statements from him. The Supreme Court has explained the reasoning behind this prong of the inquiry:

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Kuhlmann*, 477 U.S. at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384–85 (quoting *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487, 88 L. Ed. 2d at 496). It should be noted that the burden of proving deliberate elicitation, like agency, rests with the defendant. *See id.* ("[T]he defendant must demonstrate . . . .").

Justice Powell's concurrence in *Henry* makes clear that "the Sixth Amendment is not violated when a passive listening device collects, but does not induce, incriminating comments" and that "the mere presence of jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional." *Henry*, 447 U.S. at 276, 100 S. Ct. at 2190, 65 L. Ed. 2d at 126 (Powell, J., concurring). It is Justice Powell's concurrence that the Supreme Court cited and relied on in *Kuhlmann* and *Moulton* when it clarified the deliberate-elicitation element. *See Kuhlmann*, 477 U.S. at 459, 106 S. Ct. at 2629–30, 91 L. Ed. 2d at 384; *Moulton*, 474 U.S. at 176, 106 S. Ct. at 487, 88 L. Ed. 2d at 496.

Before I get to Martin, I would like to briefly comment on Johnson. The court concedes only grudgingly that Johnson did not deliberately elicit incriminating information from Marshall. In fact, the only question

that Johnson asked Marshall was the classic icebreaker: What are you in for? As Johnson testified, "I knew [Marshall] so I asked him what was he in there for." *Kuhlmann* makes clear that establishing deliberate elicitation requires more. *See* 477 U.S. at 459, 106 S. Ct. at 2629–30, 91 L. Ed. 2d at 384 (condemning techniques that are "the equivalent of direct police interrogation"). Asking one question of such a generic nature does not amount to the functional equivalent of interrogation. *See United States v. Rosa*, 11 F.3d 315, 330 (2d Cir. 1993) (finding that a witness who ran into the defendant unexpectedly in jail and asked the defendant why he was there did not try to solicit information). The trial testimony reveals that *Marshall* initiated the more detailed discussions about the shooting of Versypt. As Johnson testified,

> Q. . . . . And he just happened to start suddenly talking to you about his case? A. He didn't just start talking to me over just a couple days. He started talking to me, yes.
>
> . . . .
>
> Q. And only when you're alone in segregation does he suddenly open up to you, correct? A. Yeah. He told me about it a little bit, yeah.

There is no evidence that Johnson asked Marshall any additional questions or even made suggestive comments when Marshall was describing to him the circumstances of Versypt's death.

This should end any need to discuss Johnson further, but the court goes on. In particular, it indicates that Marshall's trial counsel may have been ineffective, that counsel's supposed failure to cross-examine Johnson on the subject of elicitation was "remarkable," and that counsel may not have been aware of the deliberate-elicitation requirement. Although I agree with the court's ultimate resolution of the *Massiah* claim regarding Johnson, these innuendoes are unfair. The

questions and answers quoted above *come from defense counsel's cross-examination of Johnson.* The deliberate-elicitation requirement had just been discussed at some length when the court ruled on the motion to suppress the previous afternoon.[6]

Courts addressing *Massiah* claims with facts like these have found that no deliberate elicitation occurred. *See, e.g., United States v. Jacques,* 684 F.3d 324, 330–32 (2d Cir. 2012) (holding that no violation of the right to counsel occurred when a friend of the defendant cooperated with the FBI in speaking to the defendant through a series of monitored phone calls and the friend asked no more than a few questions that were not of "a probing nature"); *Whitten,* 610 F.3d at 192–94 (denying Sixth Amendment claim when the defendant volunteered incriminating information during conversation that the defendant

---

[6]Obviously, cross-examination is more an art than a science. Defense lawyers need to weigh the downside of bringing out or reinforcing that which harms their clients against the upside of bringing out or reinforcing that which helps their clients. We were not on the scene making these difficult decisions in real time.

For related reasons, I do not see the relevance of *United States v. Pannell,* 510 F. Supp. 2d 185 (E.D.N.Y. 2007). In that case, the district court made a specific finding based on its own observations that the informant was not credible:

> Miller testified that he never asked Pannell any questions about his case and that Pannell volunteered the information during lengthy conversations about general, everyday matters. Having carefully observed Miller, his testimony that Pannell volunteered detailed incriminating information—as memorialized in Miller's notes—without any prompting or encouragement from Miller cannot be credited . . . . Miller was evasive and gave conclusory answers when questioned as to how Pannell had provided such painstakingly detailed information about his involvement in the post office robbery, repeatedly saying, "we conversated." Indeed, Miller would not acknowledge that, in the course of their conversations, even on everyday matters, he had ever asked Pannell a single question. I therefore discredit Miller's testimony that he never asked Pannell any questions about his case nor encouraged him to speak of it.

*Id.* at 192. In contrast, the district court here made no such finding. And unlike the trial judge, we did not have the opportunity to see and hear the witnesses.

initiated); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 895–96 (3d Cir. 1999) (finding no deliberate elicitation when the defendant had reached out to informant and the informant had largely just listened, asking only "a few clarifying questions"); *Lightbourne*, 829 F.2d at 1021 (finding that alleged an Sixth Amendment violation was not supported by sufficient evidence where the informant "took no actions to stimulate the incriminating remarks"); *Wallace v. Price*, 265 F. Supp. 2d 545, 569 (W.D. Pa. 2003) (noting there was "no evidence that [the informant] initiated the conversation with [the defendant]" and upholding magistrate's ruling that the defendant had failed to direct the court to any evidence that the informant deliberately elicited statements).

Turning to Martin, the court today says "there is no doubt that he deliberately elicited incriminating statements from Marshall." I disagree. Events happened in the following sequence. First, Marshall denied involvement in the Versypt killing to Martin. Then, over time, Marshall "started switching his story up," according to Martin. Marshall told Martin he had a gun with which he shot Versypt when Versypt startled him. Marshall added that he had wiped off the gun and run away. At that point, Marshall asked Martin for advice on manslaughter. Martin researched manslaughter for Marshall and reported back. Only then did Martin recommend that Marshall write down his "side of the story . . . to get a lesser charge." Marshall provided his written statement with the mutual understanding and plan that this statement would be passed along to law enforcement:

> Q. When you were speaking with your attorney and to Officer Smithey, did you think that you were helping Justin Marshall? A. Yes.
>
> Q. Did you believe that you were doing what Mr. Marshall had asked you to do? A. Yes.

Viewing the entire sequence of events, Martin did not engage in deliberate elicitation. Marshall voluntarily told Martin what had happened and asked for Martin's legal advice on getting a lesser charge. Thereupon Martin advised Marshall to write down his story so Martin could deliver it to Martin's attorney and from there to law enforcement. This was poor advice, but it wasn't deliberate elicitation. This case to some extent resembles *United States v. Booker*, where the defendant "voluntarily approached Blickley and sought his assistance researching certain legal issues relating to this case." No. 05-313 (JBS), 2006 WL 242509, at *8 (D.N.J. Feb. 2, 2006). As the court described in that case:

> [T]he entire purpose of Booker's request was to enlist Blickley's help. . . . . [T]hat task necessarily required Booker to furnish Blickley with details about his case. Moreover, Blickley actually furnished advice to Booker, based on research, regarding suppression of evidence in this case and legal issues in other matters, and Blickley drafted a memorandum for Booker that led to the dismissal of unrelated bank robbery charges against Booker under the Speedy Trial Act, according to Blickley's testimony. It is understandable that a lot of talking transpired between Blickley and Booker in January given the range of legal assistance Booker was seeking from Blickley. That Blickley may have asked certain clarifying questions of Booker during their many conversations, or that Blickley told Booker to be completely truthful, does not alter the voluntariness of Booker's disclosures.

*Id.*

Moreover, in this case, Marshall *knew* Martin would be passing along his written statement to law enforcement. Thus, concerns about an "undisclosed undercover informant" and "surreptitious interrogations" were simply absent here. *Henry*, 447 U.S. at 273, 100 S. Ct. at 2188, 65 L. Ed. 2d at 123–24; *Massiah*, 377 U.S. at 206, 84 S. Ct. at 1203, 88 L. Ed. at 250. Again, as the Supreme Court put it in *Kuhlmann*, "[T]he primary concern of the *Massiah* line of decisions is secret interrogation

by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann,* 477 U.S. at 459, 106 S. Ct. at 2630, 91 L. Ed. 2d at 384. In *Kuhlmann,* an undisclosed informant commented to the defendant that his initial version of what happened "didn't too sound too good"; a few days later, the defendant made incriminating statements. *Id.* at 439–40, 106 S. Ct. at 2619–20, 91 L. Ed. 2d at 372. Yet, considering the entire "interaction," the Court found that no deliberate elicitation had occurred. *Id.* at 460, 106 S. Ct. at 2630, 91 L. Ed. 2d at 385. Looking at the entire interaction here, I think this is an easier case than *Kuhlmann*: There was nothing "secret" here. Martin was open about what he was doing and advised Marshall to write down his story only after Marshall had given Martin the same story orally and asked for Martin's legal advice.

**V. Conclusion.**

For the reasons stated, I would affirm Marshall's conviction and the well-reasoned suppression ruling of the district court.

Waterman and Zager, JJ., join this concurrence in part and dissent in part.